M. F. LOFTUS et al., Appellees, v. DEPARTMENT OF AGRICULTURE OF IOWA et al., Appellants.

No. 40215.

SEPTEMBER 22, 1930.

REHEARING DENIED DECEMBER 13, 1930.

568

*John Fletcher,* Attorney-general, *Earl F. Wisdom,* Assistant Attorney-general, *H. H. Matt,* and *L. D. Prewitt,* for appellants.

*William H. Salisbury, Kugler & Bartlett,* and *B. N. Hendricks,* for appellees.

*J. B. Newman, W. H. Antes, Sager & Sweet,* and *Senneff, Bliss, Witwer & Senneff, Amici Curiae.*

KINDIG, J.—The plaintiffs-appellees claim that Chapter 129 of the 1927 Code, as amended (Acts Forty-third General Assembly, Chapter 75), is unconstitutional and void. This legislation was enacted by the state for the purpose of controlling and eradicating bovine tuberculosis. Section 2 of the amendment declares:

"The state of Iowa is hereby declared to be and is hereby established as an accredited area for the eradication of bovine tuberculosis from the dairy and breeding cattle of the state."

Quarantine is authorized, and tubercular cattle may be destroyed or otherwise disposed of by the department of agriculture. Inspectors or testers are arranged for in the legislation, and these agents may apply the tuberculin or other tests, to determine the existence or nonexistence of tuberculosis in the cattle. Various phases of this legislation have been before us at different times. See *Peverill v. Board of Supervisors,* 201 Iowa 1050; *Fevold v. Board of Supervisors,* 202 Iowa 1019; *Lausen v. Board of Supervisors,* 204 Iowa 30; *Peverill v. Board of Supervisors,* 208 Iowa 94.

Appellees are the owners of dairy and breeding cattle in Mitchell County. Defendants-appellants include the state department of agriculture, its secretary, and other state and county officers who are commanded by law to enforce the Bovine Tuberculosis Statute aforesaid. It was stipulated in the district court that, unless the injunction was granted by that tribunal, the de-

fendants would proceed under the law to apply the tuberculin test to appellees' cattle. Also, it was stipulated that the department of agriculture had claimed to locate tuberculosis in certain animals in appellees' herds. So, too, it was stipulated that, unless prevented by injunction, the department of agriculture would order the slaughter of those animals which reacted to the tuberculin test. Hence, appellees bring this action to obtain an injunction, in order that the Bovine Tuberculosis Statute aforesaid will not be enforced. Foundation for the action, as before said, is that the legislative act in question is unconstitutional. Basis for this contention is that the legislation under attack does not provide due process of law, and permits an unreasonable exercise of the police power, allows arbitrary action by the enforcing officers, authorizes the administrative department to unlawfully enact and enforce rules and regulations, is not uniform in its operation, combines in one testing agent the duties of administrative and judicial officers, and otherwise is repugnant to the state and Federal Constitutions. Hence, it is urged, the legislation is in conflict with Articles 1, 3, 4, and 5 of the Iowa Constitution and the Fourteenth Amendment to the United States Constitution.

There is presented, then, the problem of determining the merits of appellees' contentions aforesaid. Unconstitutionality, if any exists, arises because the state legislature exceeded its powers when enacting the particular laws now being considered.

Under our system of government, the law-making power is vested in the legislature. Such power was originally in the people. Likewise, in our civil government, the administrative and judicial authority originated with the people themselves. These three fundamental prerogatives were granted by the people, through appropriate constitutional and legislative provisions, to the legislative, administrative, and judicial departments of the state government. Each department of government is an agency of the people. No department can exercise any power or authority not granted to it by the people. By conferring a particular power or authority upon one department, the people thereby indicated that they withheld such power or authority from the other departments. Power to legislate was significantly and intentionally conferred upon the legislative

department. Consequently, the courts cannot interfere with the exercise of that power and authority by the legislature. It is only when the legislature attempts to exercise a power which it does not possess, because of state or Federal constitutional prohibitions, that the duty devolves upon the court to declare the act unconstitutional. Through such declaration, the court, as an agency of the people, reports back to them that another agency—the legislature—has thus exceeded its power. Unless the legislature has usurped powers prohibited by said Constitutions, the courts will not interfere. The unconstitutionality must "plainly, clearly, and palpably appear." Even if the constitutionality of a legislative act is doubtful, the courts will resolve the benefit of the doubt in favor of the legislature's power. As said in *City of Des Moines v. Manhattan Oil Co.*, 193 Iowa 1096, on page 1117:

"There is no presumption against the validity of an act of the legislature. On the contrary, all presumptions are in its favor, and a statute will not be held unconstitutional unless its contravention of constitutional guaranties is so clear, plain, and palpable as to leave no reasonable doubt on the subject * * *."

For authorities announcing the same doctrine, see *State v. Hutchinson Ice Cream Co.*, 168 Iowa 1 (local citation 10); *State v. Fairmont Cream. Co.*, 153 Iowa 702 (local citation 706); *Hubbell v. Higgins*, 148 Iowa 36 (local citation 47); *McGuire v. Chicago, B. & Q. R. Co.*, 131 Iowa 340 (local citation 348); *Stewart v. Board of Supervisors*, 30 Iowa 9 (local citations 11, 19). See, also, *Kimball v. Board of Supervisors*, 190 Iowa 783 (local citation 792). When the constitutionality of a legislative act is challenged by a litigant, the burden is upon him to show why the legislation thus should be overthrown and rejected. *People v. Teuscher*, 129 Misc. Rep. 94 (221 N. Y. Supp. 20, 25). See the other cases above cited.

Have the appellees met this burden in the case at bar? That is the question. Convenience suggests that appellees' attack on the Bovine Tuberculosis Statute be discussed in the order named.

I. Is the legislation under consideration within the police power of the state? If so, is there provided due process of law in the enforcement thereof?

Police power is constantly exercised by the state; yet a definition of such power has never been definitely and precisely formulated. In fact, public policy rather demands that there be no specific definition. See *Stettler v. O'Hara*, 69 Ore. 519 (139 Pac. 743). Each case as it arises must be determined according to its own facts. *State v. Schlenker*, 112 Iowa 642. During its discussion in the case of *Jacobson v. Massachusetts*, 197 U. S. 11, the United States Supreme Court said:

"The authority of the state to enact this [vaccination] statute is to be referred to what is commonly called the police power,—a power which the state did not surrender when becoming a member of the Union under the Constitution. Although this court has refrained from any attempt to define the limits of that power, yet it has distinctly recognized the authority of a state to enact quarantine laws and 'health laws of every description;' indeed, all laws that relate to matters completely within its territory, and which do not by their necessary operation affect the people of other states. According to settled principles, the police power of a state must be held to embrace at least such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety."

Again, the Supreme Court of the United States said in *Lawton v. Steele*, 152 U. S. 133:

"The extent and limits of what is known as the police power have been a fruitful subject of discussion in the appellate courts of nearly every state in the Union. It is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. Under this power, it has been held that the state may order the destruction of a house falling to decay, or otherwise endangering the lives of passers-by; the demolition of such as are in the path of a conflagration; the slaughter of diseased cattle; the destruction of decayed or unwholesome food; the prohibition of wooden buildings in cities; the regulation of railways and other means of public conveyance, and of interments in burial grounds; the restriction of objectionable trades to certain localities; the com-

pulsory vaccination of children; the confinement of the insane or those afflicted with contagious diseases; the restraint of vagrants, beggars, and habitual drunkards; the suppression of obscene publications and houses of ill fame; and the prohibition of gambling houses and places where intoxicating liquors are sold. Beyond this, however, the state may interfere wherever the public interests demand it, and in this particular, a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests. *Barbier v. Connolly,* 113 U. S. 27; *Kidd v. Pearson,* 128 U. S. 1. To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts.''

Health measures, generally speaking, are within the police power. Consideration of whether a particular legislative enactment is within the police power involves the substance of the law, as distinguished from the mere name given it. Labeling an act a health measure does not make it such if, in fact, the subject-matter thereof does not relate to health in the way required for due process of law. *Lawton v. Steele* (152 U. S. 133), supra. So, too, the method prescribed for enforcing a given statute may be so arbitrary and unreasonable as to subject such legislative enactment to judicial interference, and thereby bring upon it the condemnation that it does not afford due process. *Peverill v. Board of Supervisors* (208 Iowa 94), supra; *Durand v. Dyson,* 271 Ill. 382 (111 N. E. 143); *Atlantic Coast Line R. Co. v. City of Goldsboro,* 232 U. S. 548. During the discussion in the *Goldsboro* case, the Supreme Court of the United States suggested:

''Of course, if it appear that the regulation under criticism is not in any way designed to promote the health, comfort,

safety, or welfare of the community, or that the means employed have no real and substantial relation to the avowed or ostensible purpose, or that there is wanton or arbitrary interference with private rights, the question arises whether the law-making body has exceeded the legitimate bounds of the police power.''

Everything depends, therefore, upon the nature of the legislation and the method prescribed for its enforcement. Tested by those standards, is the present legislation so within the police power that it affords due process of law?

We are constrained to hold that it is. Bovine tuberculosis is very generally recognized as injurious to cattle, hogs, and poultry. This disease will spread from the cattle to the hogs and poultry. Cattle, hogs, and poultry are so associated with domestic use that the tubercular germ in the live stock and poultry jeopardizes human beings. Transmissibility of the bovine type of tuberculosis to human beings is generally conceded by medical experts. Such bovine tuberculosis, generally speaking, occurs in the human being not so much in the pulmonary as in the bone and other types. Milk from the cows contains the tubercular germ, and children and other users of the milk become infected. It appears that every state in the Union has recognized this evil, and enacted laws to control and stamp out bovine tuberculosis. Moreover, the United States government likewise has recognized the danger, by enacting co-operative legislative measures. Voluminous evidence upon this subject was taken, pro and con, in the case at bar. While there is a conflict, it appears certain from the preponderance of the testimony that the bovine tubercular germ is an active and effective enemy of the human being. All people within the state are in danger. Consequently, the public interest generally demands that the destructive tubercular germ be controlled and eliminated.

Courts have frequently upheld the constitutionality of statutes which control and regulate bovine tuberculosis. That is done upon the theory that the legislation is within the police power. *Fevold v. Board of Supervisors* (202 Iowa 1019), supra; *Peverill v. Board of Supervisors* (208 Iowa 94), supra; *Lausen v. Board of Supervisors* (204 Iowa 30), supra; *People v. Teuscher* (129 Misc. Rep. 94 [221 N. Y. Supp. 20]), supra; *State ex rel. Spillman v. Heldt*, 115 Neb. 435 (213 N. W. 578); *State ex*

*rel. Spillman v. Splittgerber,* 119 Neb. 436 (229 N. W. 332) ;
*Kroplin v. Truax,* 119 Ohio St. 610 (165 N. E. 498) ; *Schulte v.
Fitch,* 162 Minn. 184 (202 N. W. 719) ; *People v. Teuscher,* 248
N. Y. 454; *Hawkins v. Hoye,* 108 Miss. 282 (66 So. 741) ; *Adams
v. City of Milwaukee,* 228 U. S. 572; *Village of Herkimer v.
Potter,* 124 Misc. Rep. 57 (207 N. Y. Supp. 35) ; *Patrick v. Riley,*
209 Cal. 350 (287 Pac. 455). Benefits from the control and
eradication of bovine tuberculosis accrue to all the people. Thus
it is a health measure, protecting all mankind. Hence the sub-
ject-matter of the legislation meets the final police power test
above required by the United States Supreme Court.

Regardless of this, however, appellees maintain that, while
the general subject-matter is within the police power, yet the
specific provision of the statute aforesaid authorizing the tuber-
culin test is not within such power. Following is a description
of the tuberculin test given by the Supreme Court of Wisconsin
in *Adams v. City of Milwaukee,* 144 Wis. 371 (129 N. W. 518) :

"This test is made by an hypodermic injection of a toxic
product of the tubercle bacilli which causes a described and
recognized rise of temperature in the animal afflicted with tuber-
culosis, but has no effect, or a different effect, upon cattle not so
afflicted."

This definition was followed by this court in *Fevold v. Board
of Supervisors* (202 Iowa 1019), supra. Appellees contend that
the tuberculin test in fact is not a test. Accuracy and dependa-
bility are lacking, they assert: for instance, appellees explain
that well cows, according to the test, will indicate tuberculosis;
while diseased cattle, when the test is applied, appear to be well.
Much testimony concerning this proposition was introduced into
the record.

On the other hand, however, there is an abundance of evi-
dence to the effect that the test, although not perfect, is reliable
and dependable. The evidence being thus in dispute, it is not
for the courts to say that the legislature did not have the consti-
tutional power to pass the act. *State v. Layton,* 160 Mo. 474 (61
S. W. 171) ; *Adams v. City of Milwaukee* (228 U. S. 572), supra.

However that may be, a careful reading of the evidence pro-
duced convinces us that the test is reliable, useful, and advanta-
geous. Frequently the courts have held that a statute authorizing

this tuberculin test is within the police power. *Fevold v. Board of Supervisors,* 202 Iowa 1019, supra; *Peverill v. Board of Supervisors* (201 Iowa 1050), supra; *Schulte v. Fitch,* 162 Minn. 184 (202 N. W. 719), supra; *People v. Teuscher* (248 N. Y. 454), supra; *Lausen v. Board of Supervisors* (204 Iowa 30), supra; *Adams v. City of Milwaukee,* 144 Wis. 371 (129 N. W. 518), supra; *City of New Orleans v. Charouleau,* 121 La. 890 (46 So. 911); *State ex rel. Spillman v. Heldt* (115 Neb. 435 [213 N. W. 578]), supra; *State ex rel. Spillman v. Splittgerber* (119 Neb. 436 [229 N. W. 332]), supra. As expressed in *State ex rel. Spillman v. Splittgerber,* supra:.

"The legislature may, in the exercise of the police power, require that the owners of breeding cattle submit such animals to the tuberculin test, and may adopt reasonable measures for carrying out the requirement."

During the discussion in *Adams v. City of Milwaukee* (144 Wis. 371 [129 N. W. 518]), supra, the Wisconsin court suggested:

"The tuberculin test, while not infallible, is the only reliable and useful means for testing cattle for tuberculosis."

Speaking of the tuberculin test, we said, in *Peverill v. Board of Supervisors,* 208 Iowa 94, on page 116:

"Turning now to the instant case, we find nothing to sustain the contention that the exercise of the police power of this state, by reason of the enactments herein referred to [the bovine tuberculosis statute allowing the tuberculin test], is arbitrary or unreasonable. Since we hold that the state of Iowa properly exercised its police power in enacting these statutes, it necessarily follows that the due-process clause of the Fourteenth Amendment of the Constitution of the United States does not restrict or limit the right of the state to exercise its police power as it did."

Manifestly, from all that has been said and cited, it is evident that a statute permitting the tuberculin test for dairy and beef cattle is within the police power of the state. Such test is

 not so arbitrary or unreasonable as to permit the courts, under the circumstances, to interfere with the legislature's prerogative in that regard. Under those circumstances, the legislation cannot be declared unconstitutional unless the enforcement of the act is so arbitrary and unreasonable as to deny the appellees due process of law. Claim is made by appellees that the machinery of the law does deny due process. Basis for this assertion is founded upon the thought that there is no appeal from the finding of the tester, who, representing the state department, goes among the herds and applies the tuberculin test. Without an appeal from the conclusion of this agent to what appellees term ''an impartial or judicial tribunal,'' appellees say due process of law has been denied them.

Obviously they are not correct in this. If the animal in fact is tubercular, and therefore, under the Iowa statutes, a nuisance, it may be quarantined or summarily slaughtered. Protection to the health of mankind cannot be accomplished otherwise. Long delayed court or other procedures would furnish an opportunity for the tubercular germ to infect children and others. Summary action in the premises is essential. Otherwise the government cannot be effective enough to protect its inhabitants against tuberculosis or other plagues. It being assumed that appellees' cattle are infected with tuberculosis, due process of law is not denied by a summary quarantine, or even destruction of the animals. In *Jacobson v. Massachusetts* (197 U. S. 11), supra, the United States Supreme Court explained as follows:

''Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others. This court has more than once recognized it as a fundamental principle that 'persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health, and prosperity of the state; of the perfect right of the legislature to do which no question ever was, or upon acknowledged general principles ever can be, made, so far as natural persons are concerned.' ''

So, here, the appellees have no right to complain that the state, for the protection of its inhabitants, quarantines or destroys cattle if, in fact, they are tubercular. Ex-parte determination may be made of the cattle's condition. *Fevold v. Board of Supervisors* (202 Iowa 1019), supra; *Peverill v. Board of Supervisors* (208 Iowa 94), supra; *Kroplin v. Truax*, 119 Ohio St. 610 (165 N. E. 498); *People v. Teuscher* (129 Misc. Rep. 94 [221 N. Y. Supp. 20]), supra; *Arbuckle v. Pflaeging*, 20 Wyo. 351 (123 Pac. 918). It was suggested in *North American C. S. Co. v. City of Chicago*, 211 U. S. 306:

"We are of opinion * * * that provision for a hearing before seizure and condemnation and destruction of food which is unwholesome and unfit for use, is not necessary. The right to so seize is based upon the right and duty of the state to protect and guard, as far as possible, the lives and health of its inhabitants, and that it is proper to provide that food which is unfit for human consumption should be summarily seized and destroyed, to prevent the danger which would arise from eating it. The right to so seize and destroy is, of course, based upon the fact that the food is not fit to be eaten. Food that is in such a condition, if kept for sale or in danger of being sold, is in itself a nuisance, and a nuisance of the most dangerous kind, involving, as it does, the health, if not the lives, of persons who may eat it."

Also, we find in *Kroplin v. Truax* (119 Ohio St. 610 [165 N. E. 498]), supra, on page 621, the following excerpt:

"In providing measures for the protection of public health, the destruction or summary abatement of public nuisances inimical to the public health may be ordered. Unwholesome food may be destroyed; diseased cattle may be slaughtered."

To the same effect is the statement found in *Peverill v. Board of Supervisors* (208 Iowa 94), supra. Reference is made to the following:

"If the legislature, in enacting this law, was exercising its rights under the police power, then it could, if it so elected, authorize the testing of these cattle and the destruction of those

found infected, without notice and hearing, and without even providing compensation therefor.''

It being assumed, then, that the cattle have tuberculosis, the right to accomplish their destruction is within the police power, and in such event, the owner is not denied due process of law. That is true for the reason that the state, under such circumstances, is acting within the scope of the police power, and no other legal process is due the owner. Appellees' rights, as owners, to something further in the way of legal process can only arise in the event that the state, through its agents, usurps some authority not within the police power. Confusion, under the facts in this case, is not to be made between an exercise of the police power and due process of law. If the act is within the police power, the due-process guaranty is not violated. Principles underlying police power and due process of law are not in conflict. The boundaries of the one end where the limits of the other begin. Here it is argued that the state, through the statute under consideration, is about to go beyond the field of its police power, and, in that outside realm, usurp ungranted authority. Such usurpation takes place, it is claimed, when an animal which does not in fact have tuberculosis is condemned and slaughtered. Usurpation and use of such ungranted power, appellees contend, would not be an action within the police power. Basis for appellees' contention in this regard is that they are entitled to notice and an opportunity to be heard on the question of whether the state's action in a given case is within the police power. Putting the thought differently, appellees maintain that the cattle in question are not tubercular, and that the truth of the fact must be determined after notice to them and an opportunity to be heard in the matter. Thus appellees assert that, before the state can exercise the aforesaid police power, it must be determined, after notice and hearing, that the cattle are in fact tubercular. So appellees conclude that the legislation in question is unconstitutional because it does not provide for such notice and hearing. Are appellees without a remedy? Does the law deny them the right to a hearing after notice? No provision is contained in the tuberculosis law under consideration which denies the appellees a hearing on the question of whether the cattle are infected. It is true that

such hearing, through the necessity of the case, may, and sometimes must, be after the condemnation and destruction. Nevertheless, due process is provided in the event that animals not diseased are destroyed. At this point, the owner, after condemnation and destruction, may sue the destroying agent at common law for damages. This is essential for due process of law. (That does not prevent the owner, under such circumstances, from seeking and obtaining injunctive or some other suitable relief before condemnation and destruction.) Such due process, under certain conditions, as before indicated, does not demand a judicial hearing before the cattle are quarantined or destroyed. That is so because of the danger to health involved. Delay under such circumstances would probably cause injury to, or even the death of, human beings. Nevertheless, the owner of cattle is entitled to a hearing on the question of whether the animal in fact has tuberculosis. Said hearing is demanded by the due-process guaranty. *Miller v. Horton,* 152 Mass. 540 (26 N. E. 100) ; *Lowe v. Conroy,* 120 Wis. 151 (97 N. W. 942) ; *Pearson v. Zehr,* 138 Ill. 48 (29 N. E. 854). During its discussion in the *Pearson* case, the Illinois court said:

"To permit the commissioners to determine *ex parte* that some of the horses had the glanders, and that the others had been exposed thereto, and to hold that determination a justification for slaughtering the horses, without imposing upon appellants [the destroying agents] the burden of establishing affirmatively the actual existence of such disease and such exposure, *would not be a valid exercise of the police power of the state, but would be a palpable violation of the constitutional provision that no person shall be deprived of property without due process of law.*" (The italics are ours.)

Likewise, the Supreme Court of Wisconsin, in the *Lowe* case, declared:

"While such a determination [the one made by the health officer] has been held to be a full protection to all persons acting under it in carrying out the purposes of the law,—that is, to abate, and, if necessary, destroy, that which is in fact a nuisance or source of danger to health,—yet it is no protection for destroying private property which *in fact* is no such nuisance or

580

source of danger. This is upon the ground that *due process of law* [italics are ours] requires that the owner be given an opportunity to be heard at a trial before his private property can be adjudged forfeited for his misconduct, or for the protection of the public health. He cannot be deprived of the right, either before or after such taking of his property, to have * * * [an] inquiry whether *in fact* he has forfeited the right to his property by coming within the condemnation of the law.''

As previously said, however, such hearing need not be before, but can be after, the animals are quarantined or destroyed. In *North American C. S. Co. v. City of Chicago* (211 U. S. 306), supra, the foregoing idea is expressed by the Supreme Court of the United States in the following language:

''A determination on the part of the seizing officers * * * is not a decision which concludes the owner. The *ex parte* finding of the health officers as to the fact [that the subject seized is injurious to health and therefore subject to condemnation] is not in any way binding upon those who own or claim the right to sell the food. If a party cannot get his hearing in advance of the seizure and destruction, he has the right to have it afterward, which right may be claimed upon the trial in an action brought for the destruction of his property; and in that action, those who destroyed it can only successfully defend if the jury shall find the fact of unwholesomeness, as claimed by them.''

Also, the Supreme Court of Massachusetts, in *Miller v. Horton* (152 Mass. 540 [26 N. E. 100]), supra, declared:

''Of course there cannot be a trial * * * before killing of animal supposed to have a contagious disease, and we assume that the legislature may authorize its destruction in such emergencies without a hearing beforehand. But it does not follow that it can throw the loss on the owner without a hearing. If he cannot be heard beforehand, he may be heard afterwards. The statute may provide for paying him in case it should appear that his property was not what the legislature has declared to be a nuisance, and may give him his hearing in that way. If it does not do so, the statute may leave those who act under it to proceed at their peril, and the owner gets his hearing in an action against them.''

The same thought is expressed in *Fevold v. Board of Supervisors* (202 Iowa 1019), supra:

"Many of the cases above referred to [during the discussion in that case], as well as cases cited by appellants, recognize the doctrine that an ex-parte determination that animals are suffering from a contagious or infectious disease is not conclusive on the owner, and that the question whether they were in fact so afflicted may be determined in an action by the owner for the destruction of his property. But this goes to the remedy of the owner in case his property was destroyed without his agreement, and when, in fact, it was not subject to destruction, and not to the validity of statutes requiring cattle to be tested."

To the same effect, see *Adams v. City of Milwaukee* (228 U. S. 572), supra; *Waud v. Crawford,* 160 Iowa 432; *Durand v. Dyson,* 271 Ill. 382 (111 N. E. 143). Wherefore, the owner of cattle is guaranteed a hearing to determine whether the animals are infected with tuberculosis. Events may demand that such hearing be after, rather than before, the condemnation and destruction. Yet the remedy is present all the time. Consequently, due process of law is guaranteed even though the state agents may, perchance, step beyond the realm of the police power; for, if such state representatives destroy healthy cattle, the owner may recover damages for the loss thereof.

Of course, if the owner consents to the destruction of his cattle, he is not denied due process of law when they are destroyed by state representatives. Not only is the foregoing true, but, in addition thereto, the statute specifically provides for the appraisement of the animals, and at least partial compensation to the owner for the loss thereof in case they are destroyed. With said compensation and the aforesaid permissive right to sue the destroyer for wrongful destruction, the owner is protected, as previously suggested. Therefore the statute under consideration is not arbitrary or unreasonable, and it does not deny appellees due process of law in this regard.

Continuing their attack, however, on the statute, appellees claim that the serum injures the cattle, in that it causes abortion, and stringy and unhealthful milk, and even frequently introduces the disease into the bodies of healthy animals, and sometimes causes their death. Testimony is introduced concerning

582

this contention. At this juncture it is asserted that the statute fails to provide due process of law because there is no remedy in such instance; for, if the tester is not negligent, he cannot be liable, because the statute authorizes his use of the tuberculin test. Whether, in the event that the tuberculin test had such injurious or fatal effect upon the cattle, there would be due process of law under the statute, we do not now decide, because the evidence in the record demands a finding contrary to appellees' allegations against the tuberculin test. Much of appellees' evidence in said regard amounts to the mere conclusions of nonexperts, while other portions thereof consist of what a certain somewhat prejudiced expert has heard or read, rather than the results of his own experience and practice. At least, it does not satisfactorily appear that the aforesaid evil result will occur if the test is carefully made, with the correct amount of the proper serum.

Appellants, on the other hand, have furnished expert evidence to prove that the serum is not harmful to the animals. If, then, the tuberculin test, when rightly applied, does not materially injure the cattle, we cannot say that the appellees are denied due process of law, under this particular proposition.

From the foregoing discussion, it is apparent that the act does not vest in the state enforcing agents arbitrary or unreasonable power. Neither arbitrariness nor unreasonableness is contemplated by the act. These testing agents are required to pass adequate examinations, and to qualify for the positions. We cannot presume that they will not perform their duties according to the law. There is no reason in this respect to hold that the act is unconstitutional.

II. An attack is made upon the statute because it is not uniform in its operation. Reason for this complaint asserted by appellees is that the provision for compensation is not uniform. Section 12, Chapter 75, Acts of the Forty-third General Assembly, provides:

"No compensation shall be paid to any person for an animal condemned for tuberculosis unless said animal, if produced in, or imported

into, the state has been owned by such owner for at least six months prior to condemnation or was raised by such person.''

The right to compensation for diseased animals is not absolute. They, being nuisances, may be destroyed without compensation. *Fevold v. Board of Supervisors* (202 Iowa 1019), supra; *Kroplin v. Truax* (119 Ohio St. 610 [165 N. E. 498]), supra; *Peverill v. Board of Supervisors* (208 Iowa 94), supra. Such provision for compensation contained in the aforesaid statute is a mere gratuity to the owner. *Patrick v. Riley* (209 Cal. 350 [287 Pac. 455]), supra. It being such, the recipient cannot complain concerning the limitations upon his right to receive it. Moreover, the law does apply equally to all of the class named in the statute. Clearly, the purpose of the legislation was to stamp out tuberculosis and prevent speculators from buying up diseased cattle for sale to the state. No reason appears, because of this particular objection, why the act should be declared unconstitutional.

III. Complaint is made by the appellant that the statute in question combines in one testing agent the duties of administrative and judicial officers.

Provisions made in the statute for the testing officer are a part of the police power. Discretion is frequently lodged in ministerial officers. Thus lodging discretion does not necessarily violate any constitutional prohibition. *O'Brien v. Barr,* 83 Iowa 51; *Brady v. Mattern,* 125 Iowa 158; *McSurely v. McGrew,* 140 Iowa 163; *State v. Mason City & F. D. R. Co.,* 85 Iowa 516; *Hunter v. Colfax Cons. Coal Co.,* 175 Iowa 245. Administrative officers may, within proper limitations, exercise discretion, find facts, and exercise judgment. *Hunter v. Colfax Cons. Coal Co.* (175 Iowa 245), supra; 6 Ruling Case Law 174 to 181, inclusive. See, also, *Chehock v. Independent Sch. Dist.,* 210 Iowa 258; *Schulte v. Fitch* (162 Minn. 184 [202 N. W. 719]) supra. Boards exercising administrative functions may promulgate and adopt rules and regulations. *Pierce v. Doolittle,* 130 Iowa 333. Upon the general subject, see, also, *Ferguson v. Starkey,* 192 Ala. 471 (68 So. 348); *Reims v. State,* 17 Ala. App. 128 (82 So. 576); *Kansas*

*City Southern R. Co.· v. State,* 90 Ark. 343 (119 S. W. 288); *People v. Lange,* 48 Colo. 428 (110 Pac. 68); *Whitaker v. Parsons,* 80 Fla. 352 (86 So. 247); *Schulte v. Fitch,* 162 Minn. 184 (202 N. W. 719); *Abbott v. State,* 106 Miss. 340 (63 So. 667); *In re Application of Goddard,* 44 Nev. 128 (190 Pac. 916); *State v. Railroad,* 141 N. C. 846 (54 S. E. 294); *Neer v. State L. S. San. Board,* 40 N. D. 340 (168 N. W. 601); *Bishop v. State,* 122 Tenn. 729 (127 S. W. 698); *Smith v. State,* 74 Tex. Cr. 232 (168 S. W. 522); *Serres v. Hammond* (Tex. Civ. App.), 214 S. W. 596; *Richter v. State,* 16 Wyo. 437 (95 Pac. 51); *Arbuckle v. Pflaeging,* 20 Wyo. 351 (123 Pac. 918).

Nothing appears under this proposition, therefore, to warrant the holding that the law is unconstitutional. Other matters are presented by appellees in their argument, but their contentions are all overruled in the Iowa cases above cited. Therefore, a restatement of the principles is not necessary at this time.

Because the Bovine Tuberculosis Law is not unconstitutional, the judgment and decree of the district court should be, and hereby is, reversed.—*Reversed.*

Morling, C. J., and Evans, Stevens, De Graff, Wagner, and Grimm, JJ., concur.