[Civ. No. 6124. Third Appellate District.—November 4, 1938.]

AFFONSO BROS. et al., Appellants, v. A. A. BROCK, as Director of the Department of Agriculture, et al., Respondents.

James L. Royle and Alfred L. Bartlett for Appellants.

U. S. Webb, Attorney-General, Ralph H. Cowing and Eugene M. Elson, Deputies Attorney-General, Ben Harrison, United States Attorney, and Francis C. Whelan, Assistant United States Attorney, for Respondents.

THOMPSON, J.—Eight hundred owners of different herds of cattle, who maintain dairies in Merced County, joined in this suit to restrain the Director of the Department of Agriculture of California, the officers of the Animal Industry Division of the State Department of Agriculture and the agents and employees of the United States Department of Agriculture, with whom the state authorities are authorized to co-operate in administering the law found in division 2, article 3, sections 221–254 of the Agricultural Code of California, which was adopted under the police power of the state to eradicate bovine tuberculosis, from testing, segregating, quarantining, branding and slaughtering dairy cattle which are afflicted with that disease.

It is contended article 3 of division 2 of the Agricultural Code is unconstitutional because it authorizes the taking of property without due process of law by permitting veterinarians to test, brand, segregate, appraise and slaughter diseased cattle without notice or the privilege of a hearing by the owners thereof, and for the reason that it confers an illegal delegation of judicial and legislative authority upon veterinarians.

The complaint alleges that the several plaintiffs own bands of cattle in Merced County which are used in operating dairies, among which there are "a number of cattle" healthy, clean and free from tuberculosis, which the defendants have arbitrarily tested, condemned as tubercular, segregated, branded and slaughtered without notice, hearing or an opportunity on the part of the owners thereof to disprove the existence of the asserted disease in the cattle, and that the officers threaten to continue to test, condemn and destroy large numbers of plaintiffs' dairy cattle without notice, hearing or adequate compensation. It is not alleged the disease

did not exist among the cattle nor that it is not now prevalent in the herds. The complaint merely asks for injunctive relief to restrain the defendants from enforcing the provisions of the California Bovine Tuberculosis Act, being sections 221–254 of the Agricultural Code, on the ground that its provisions are unconstitutional and void, as previously stated. Separate demurrers were filed by the defendants on the ground that the complaint fails to state facts sufficient to constitute a cause of action or to warrant injunctive relief. The demurrers were sustained without leave to amend the pleading. No application to amend the complaint was presented. Judgment was accordingly rendered to the effect that the plaintiffs take nothing by their action. From that judgment this appeal was perfected.

The cattle were tested, condemned and slaughtered under the provisions of the Bovine Tuberculosis Act which is found in division 2, article 3 of the Agricultural Code of California. Section 234 of that code provides that:

"The department may establish and maintain tuberculosis control areas within this state, wherein said department shall examine and tuberculin test all dairy cattle, . . . as often as may be deemed necessary, in order to determine which animals are affected with tuberculosis, . . . "

Section 226 provides that:

"Whenever the director has reason to suspect an irregularity in the application of a tuberculin test or the branding of reactors, he may enter any premises for the purpose of examining any bovine animals therein or thereon to determine if there has been any abuse or misuse of tuberculin, or faulty, unskillful or irregular technic or procedure in the application of the tuberculin test, branding of reactors, or identification of animals under tuberculin test."

Section 233 further provides that:

"The department may, in co-operation with the United States Department of Agriculture, undertake tuberculosis control in bovine animals under the accredited herd plan, in accordance with the rules and regulations of the department and the United States Department of Agriculture."

The code declares that it shall be unlawful to sell or dispose of any tuberculin within this state which is not produced under license of the Bureau of Animal Industry of the

United States Department of Agriculture. Section 223 of the article authorizes the department to "designate veterinarians, *as approved veterinarians,* to buy, possess or use tuberculin". It is declared that the use of tuberculin by any person other than a veterinarian who has been approved and licensed by the department is unlawful and punishable as a misdemeanor. Section 230 makes it unlawful for one to apply the tuberculin test to any bovine animal after it has been found by an approved veterinarian to be afflicted with that disease. When an animal has reacted to the tuberculin test and has been determined to be diseased, it is provided that it shall be tagged, branded, segregated from the herd, appraised, and slaughtered under the supervision of the director of the State Department of Agriculture within thirty days after the time of appraisal. With respect to the appraisal of a tubercular animal, section 236 reads:

" . . . The value of the animal shall be determined by appraisement by a representative of the department or a representative of the Bureau of Animal Industry of the United States Department of Agriculture, *and by the owner or his agent.* In case of failure to agree on the valuation, the animal shall be appraised by the chief appraiser of the department or his representative. . . . "

When an animal has been thus condemned, appraised and slaughtered, the owner is to receive from the state the equivalent of one-third of the appraised value of the cow, plus whatever sum has been appropriated and authorized to be paid by the United States toward the plan of eradicating tuberculosis from cattle in the state of California. It is provided that in inspecting, testing, branding and segregating cattle for examination for tuberculosis, the owner of the stock shall, upon request of the department, render assistance to the officers and that it shall be unlawful for the owners to obstruct that procedure. Section 252 then declares that:

"The slaughtering of all animals, under the provisions of this article, shall be under the supervision of an inspector of the department, or of the United States Bureau of Animal Industry."

Finally, section 254 of the Code authorizes the department to adopt reasonable rules and regulations for the purpose of carrying into effect the provisions of that article.

■ It has been definitely determined that statutes which are enacted for the purpose of eradicating bovine tuberculosis and other animal diseases detrimental to health and public welfare come within the police power, and that every reasonable intendment is in favor of their validity, on the theory that such diseased animals constitute public nuisances which may be summarily abated. It has been held that even drastic measures for the elimination of such diseases in human beings, in cattle or in farm crops are not affected by constitutional provisions of the state or of the nation. In the exercise of police power, in emergencies of that sort, private property may be summarily destroyed without compensation and without previous notice or hearing, provided a remedy exists by means of which the owner may be paid for wilful, wrongful or illegal destruction of the animals which were not in fact diseased. (*Patrick* v. *Riley*, 209 Cal. 350 [287 Pac. 455]; *People* v. *Broad*, 216 Cal. 1, 7 [12 Pac. (2d) 941]; *Stanislaus County etc. Assn.* v. *County of Stanislaus*, 8 Cal. (2d) 378, 394 [65 Pac. (2d) 1305]; *Coelho* v. *Truckell*, 9 Cal. App. (2d) 47, 54 [48 Pac. (2d) 697]; *Hacker* v. *Barnes*, 166 Wash. 558 [7 Pac. (2d) 607, 80 A. L. R. 1212]; 8 A. L. R., p. 71, note; 3 C. J., p. 54, secs. 151–153; 3 C. J., p. 1167, sec. 55; 2 Am. Jur., p. 810, sec. 160.)

In the California case of *Patrick* v. *Riley, supra,* it is said:

"It is a well-recognized principle that it is one of the first duties of a state to take all necessary steps for the promotion of the health and comfort of its inhabitants. The preservation of the public health is universally conceded to be one of the duties devolving upon the state as a sovereignty, and whatever reasonably tends to preserve the public health is a subject upon which the legislature, within its police power, may take action. That tuberculosis is a dangerous and infectious disease which attacks both human beings and domestic animals; that it is prevalent throughout the state among both human beings and domestic animals; and that it is communicated to human beings, especially to children, by milk and other food products from infected animals, stand undisputed.

"It cannot be doubted, therefore, that the primal object of the statute here involved is to promote and preserve the public health by providing a means for the control and sup-

pression of this disease among cattle. In providing measures for the protection of the public health, the destruction or summary abatement of public nuisances inimical to the public health may be ordered, for all property is held in subordination to the right of its reasonable regulation by the government clearly necessary to preserve the health, safety or morals of the people. (*Kroplin* v. *Truax*, 119 Ohio St. 610, 620–623 [165 N. E. 498, 501, 502] ; *Appeal of White*, 287 Pa. St. 259 [53 A. L. R. 1215, 134 Atl. 409].) In other words, health regulations enacted by the state under its police power and providing even drastic measures for the elimination of disease, whether in human beings, crops or cattle, in a general way are not affected by constitutional provisions, either of the state or national government. (*Lauson* v. *Board of Supervisors*, 204 Iowa, 30, 33 [214 N. W. 682, 684].) ''

Since the bovine tuberculosis statute is a valid exercise of the police power enacted to preserve public health and welfare, the testing, branding, segregating, appraisal and summary slaughter of diseased dairy cattle, without previous notice or the right to a hearing on the part of the owner thereof, is lawful. Such summary destruction of diseased cattle is not a violation of the due process clause of the federal or state Constitution. (*Dederick* v. *Smith*, 88 N. H. 63 [184 Atl. 595, 600] ; *Loftus* v. *Department of Agriculture*, 211 Iowa, 566 [232 N. W. 412, 418] ; *Kroplin* v. *Truax*, 119 Ohio St. 610 [165 N. E. 498, 501] ; *Neer* v. *State Live Stock Sanitary Board*, 40 N. D. 340 [168 N. W. 601, 605] ; *Durand* v. *Dyson*, 271 Ill. 382 [111 N. E. 143, Ann. Cas. 1917D, 84] ; 8 A. L. R., note, p. 71.) The preceding cases hold that the right of the state to summarily destroy diseased cattle under its police power for the protection of public health, is not a violation of the constitutional inhibitions against taking property without due process. That fact is determined on the theory that since the dairy cows become diseased they are a menace to other stock and to human beings, and that they have thereby lost their property value and have become public nuisances which the owners may not harbor and use to the detriment of others. Under such circumstances, property rights become subordinate to the preservation of public health, and under the police power animals which are afflicted with communicable, contagious or virulent diseases may be

summarily condemned and slaughtered for public protection and welfare. In the Dederick case, *supra*, the owner of dairy cattle contended on appeal that the New Hampshire bovine tuberculosis statute, which is similar to the California law in that regard, is unconstitutional for the reason that it deprived her of property rights without notice or the opportunity of a hearing. The appellant said in that regard:

"The right of an owner of property to have a notice and opportunity of hearing in which he may urge his rights, is fundamental."

To which contention the Supreme Court replied:

"This argument obviously rests upon the assumption that the Fourteenth Amendment to the Constitution of the United States constitutes a limitation upon the police power of the states. This is not the law. The amendment 'was not designed to interfere with the exercise of the police power of the states for the protection of the lives, liberty, and property of its citizens or for the promotion of the public safety, peace, and order'. [Here follows many supporting authorities.]

. . . . . . . . . . . .

"The contention of the plaintiff that she had a constitutional right to notice and an opportunity to be heard before a judicial tribunal before her cattle could lawfully be tested without her consent is, therefore, without foundation."

The authorities appear to be uniform to the effect that the owner of diseased animals is not entitled to a previous notice or hearing before his cattle may be tested, branded, segregated, condemned as diseased and summarily destroyed by duly authorized officers in accordance with statutes which are enacted under police power to preserve health and the public welfare. The enforcement of such statutes, vital to the peace, health or public welfare, may not be obstructed by the usual processes of law. It is apparent such delays may result in creating ravaging epidemics fatal to large herds of cattle, the destruction of industries or even the loss of human life. ██ For that reason it has been held an injunction will not issue to restrain the testing, condemning or destruction of diseased cattle pursuant to a bovine tuberculosis act adopted under police power even though the existence of the alleged disease is seriously contested. (*Neer* v. *State Live Stock Sanitary Board, supra; Durand* v. *Dyson, supra.*) This is

true because the owner has his remedy in a subsequent suit for damages for the wilful or wrongful destruction of animals which are not in fact diseased. The remedy of the cattle owners for wrongful destruction of healthy animals is found in their right to a suit for damages against the officers who are responsible for the illegal killing of the cattle. (*North American Cold Storage Co.* v. *Chicago*, 211 U. S. 306 [29 Sup. Ct. 101, 53 L. Ed. 195, 15 Ann. Cas. 276] ; *Adams* v. *Milwaukee*, 228 U. S. 572, 584 [33 Sup. Ct. 610, 57 L. Ed. 971] ; *Pearson* v. *Zehr*, 138 Ill. 48 [29 N. E. 854, 32. Am. St. Rep. 113] ; *Miller* v. *Horton*, 152 Mass. 540 [26 N. E. 100, 23 Am. St. Rep. 850, 10 L. R. A. 116] ; *Lowe* v. *Conroy*, 120 Wis. 151 [97 N. W. 942, 943, 102 Am. St. Rep. 983, 1 Ann. Cas. 341, 66 L. R. A. 907] ; 12 A. L. R. 734, note.)

 It does appear from a careful reading of the various provisions of the Bovine Tuberculosis Act that for the purpose of enforcing the police power for the protection of health, in the absence of fraud, collusion or negligence on the part of the officers, it is intended by the legislature that the testing, determination of the existence of tuberculosis, condemning, appraisal and summary destruction of diseased cattle shall be final and conclusive. In accordance with the weight of authority, that furnishes no reason for holding the act to be unconstitutional, provided the owner has a remedy by means of which he may be subsequently compensated for wilful or wrongful destruction of his cattle when they are, in fact, not afflicted with tuberculosis. Numerous cases hold there is a remedy for the wrongful and illegal destruction of healthy animals in a subsequent suit for damages against those who are responsible for the killing. The declaration of that remedy, fortified by many authorities from other jurisdictions, is found in 8 American Law Reports, at page 71. It is there said statutes for the summary destruction of diseased animals are not unconstitutional or void "although no provision was made for a notice to the owner and an opportunity for him to be heard, but the owner is frequently held entitled to a judicial hearing *after the destruction*, to contest the existence of the disease, the finding of the officers or persons called to inspect the animal before its destruction not being conclusive in this respect if there has been no notice and hearing, and not protecting the party killing the animal

from payment of damages, if, in the subsequent action by the owner, the facts are not found to be such as bring the case within the statute". (*Loftus* v. *Dept.· of Agriculture, supra; Kroplin* v. *Truax, supra.*)

It will be observed the act does not authorize the branding, segregation, appraisal or destruction of animals except those "*reacting positively to a tuberculin test* conducted by a representative of the Federal or State Department of Agriculture, or adjudged tuberculous upon physical examination by said representative". The act confers no authority upon the officers to brand, segregate, condemn or slaughter cattle which are healthy and free from tuberculosis. The killing of healthy animals is not authorized by the California statute. (*Lertora* v. *Riley,* 6 Cal. (2d) 171, 177 [57 Pac. (2d) 140].) The act provides for the testing of animals by ·expert, approved veterinarians under the supervision of the agricultural department. The tuberculin test is recognized by medical scientists and by cattlemen as an accurate and conclusive means of determining the presence of tuberculosis in animals. That method of testing cattle is highly approved. Reputable authorities declare that the tuberculin test is reliable and· that it has proved to be accurate in nearly every instance where it has been applied. (*Loftus* v. *Department of Agriculture, supra; Hacker* v. *Barnes, supra; Panther* v. *Department of Agriculture,* 211 Iowa, 868 [234 N. W. 560, 562]; *New Orleans* v. *Charouleau,* 121 La. 890 [46 So. 911, 126 Am. St. Rep. 332, 15 Ann. Cas. 46, 18 L. R. A. (N. S.) 368].) · At least it is not our province to substitute our opinion in that regard for the judgment of the legislature by assuming that the test is inaccurate or defective.

It is true that section 236 of the act requires the segrega-· tion of cattle from other healthy stock, which are "adjudged tuberculous *upon physical examination*", as well as those which have reacted to the tuberculin test. The act seems to contemplate the killing of cattle only when they have been proved to be tubercular *after reacting to the test applied.* They may not be killed after a mere physical examination. Section 231 authorizes the branding of cattle "upon the determination of such reaction." It may be assumed a mere physical examination of cattle, under some circumstances, is not a satisfactory or accurate means of determining the pres-

ence of tuberculosis in the animal. It is true that after the disease has progressed sufficiently there are often many physical evidences in the condition of the animal which may leave no doubt of the existence of the disease. ■ But the requirement of section 236 to segregate cattle found by a mere physical inspection to be diseased does not render the act unreasonable or invalid. That procedure may be deemed to be a mere preliminary precaution to prevent the spreading of the disease to other healthy cattle. Moreover, the complaint in this case does not charge that the officers determined from a mere physical examination that any of plaintiffs' cattle were diseased. Nor is it asserted that the officers threaten to condemn or slaughter any cattle merely upon such physical examination.

■ We are of the opinion the act does not constitute an unlawful delegation of authority by directing the agricultural department to "examine and tuberculin test all dairy cattle", and to brand, segregate, appraise and summarily destroy those which are found to be diseased by reacting to the test, through its representatives who are licensed veterinarians approved by the department. (*Stanislaus County etc. Assn.* v. *County of Stanislaus,* 8 Cal. (2d) 378, 388 [65 Pac. (2d) 1305]; *Coelho* v. *Truckell,* 9 Cal. App. (2d) 47, 58 [48 Pac. (2d) 697]; *Hacker* v. *Barnes,* 166 Wash. 558 [7 Pac. (2d) 607, 609, 80 A. L. R. 1212].) It is true that section 230 of the code does declare:

"It is unlawful to apply a tuberculin test to any bovine animal which has at any time been found by an approved veterinarian to be a reactor."

It is contended this section renders the determination of the department that the animal is tubercular, final and conclusive, and that it deprives the owner of the right and opportunity to procure evidence to disprove the officer's finding that the disease exists and therefore prohibits the owner from subsequently maintaining an action for damages for the erroneous and wrongful condemning and slaughtering of the animal. ■ It is also asserted section 228 of the Bovine Act, which makes it unlawful for the owner, or anyone else, to obstruct the official inspection of animals or interfere with the department or its authorized veterinarians while they are engaged in applying the tuberculin test, deprives the

owner of the opportunity to independently examine his cattle to determine whether they are in fact actually diseased.

We are of the opinion this last-mentioned section may not reasonably be so construed. There is nothing in the act to prevent the owner of dairy cows from procuring an approved veterinarian to test his cattle for tuberculosis at any time before the department has administered the test. Neither is the owner prohibited from being present with his own expert veterinarian to participate in the department's examination of the stock. The act does not deprive the owner from conducting any sort of an examination of his cattle before, after or during the process of the department's investigation, so long as he does not obstruct or interfere with the officer's examination, except that he may not *subsequently* administer a tuberculin test. The owner is not deprived of possession of the animals, even after they have been tested and condemned, until they are finally killed within thirty days after the appraisement, although they must be kept separate from healthy cows. During that period, the owner has the opportunity to employ expert veterinarians to critically examine the cattle, although they may not then inject the tuberculin test if the condemned cattle have already reacted to such a test. Moreover, the owner has the right to a post-mortem examination of the cows after they have been slaughtered. We are, therefore, of the opinion the act does not unduly deprive the owner of the opportunity of independently examining his condemned cows to determine whether they are actually afflicted with tuberculosis and to secure evidence for the proof of their freedom from disease to be used in a subsequent suit for damages in the event that they have been wrongfully slaughtered.

The most serious criticism of the act is directed to section 230 which declares that it is unlawful "to apply a tuberculin test to any bovine animal which has at any time been found by an approved veterinarian to be a reactor". Even though that section be deemed to be invalid it is not fatal to the balance of the act, and it would not prevent the inspection, testing, branding, segregation, condemning or summary destruction of cattle found to be dangerously diseased. We are of the opinion that section may be upheld as incidental to a valid exercise of police power authorizing the

summary destruction of diseased cattle for the protection of public health. The test is an important means of determining the presence or absence of tuberculosis in the animals, but it is not the only method of determining that fact. The reason assigned for that drastic section is supported by reputable authority to the effect that the injecting of serum into an animal within a short period after it has previously reacted to the tuberculin test, destroys the effect and renders negative the result of the official test. Section 230 was therefore enacted to preserve and protect the result of the examining officers when an animal has in fact reacted to their test and has been found to be dangerously diseased. We may not say the legislature was not justified in accepting the scientific theory that the injecting of tuberculin serum into an animal which has previously reacted to such a test, will destroy the effect of the official test and help defeat the purpose of the law.

There is no merit in the appellants' contention that the compensation provided by law, in the event of the slaughtering of diseased animals, is not adequate. Under the police power, diseased animals which are detrimental to health may be destroyed without compensation. (*Kroplin* v. *Truax, supra;* 67 A. L. R. 208, note; 3 C. J. Secundum, p. 1168, sec. 55b.) It follows that the owner of diseased cattle which are deemed to constitute a public nuisance detrimental to health may not complain of a mere partial compensation for their destruction. The state is not bound to pay the owner any sum whatever for animals which are necessarily killed under the police power for the preservation of public health or general welfare. The appraised value of such condemned animals determined by the authorized officer of the department and the owner of the cattle, as provided by law, is conclusive of the liability of the state for their destruction. (3 C. J. 54, sec. 152; 67 A. L. R., p. 208, note.)

Section 236 of the act authorizing the appraisal of diseased animals which are so slaughtered, by a representative of the State Department of Agriculture or an agent of the bureau of animal industry of the United States Department of Agriculture, together with the owner or his agents, is not an unlawful delegation of authority.

It is true that section 238 of the act prohibits the destruction of diseased animals until appropriations have been made by the state and funds are available to compensate the owner for the loss of his cattle as prescribed by the law. That section reads:

"No animal shall be tested or slaughtered under the provisions of this article unless:

"(a) Funds are available from an appropriation of the United States to assist in the eradication of tuberculosis in cattle in California.

"(b) Funds are available from an appropriation of this State for payment of the indemnity by the State under the provisions of this article."

That section does not justify the restraining of the officers from testing, condemning or slaughtering animals found to be diseased pursuant to the Bovine Tuberculosis Act. It is not alleged in the complaint in this case that either the state or the federal government has failed to appropriate sufficient funds with which to compensate the plaintiffs as provided by the act for all cattle which have been or may be slaughtered. The enactments of the state legislature are public records of which courts will take judicial notice. (Sec. 1875, Code Civ. Proc.; *Samish* v. *Superior Court,* 28 Cal. App. (2d) 685 [83 Pac. (2d) 305].) It appears that the sum of $1,500,000 was appropriated by the legislature in July, 1937, before the complaint in this case was filed (Stats. 1937, p. 2209) to carry out the provisions of the Bovine Tuberculosis Act. Much of that sum of money is still available for that purpose. In the absence of an affirmative allegation to the contrary, we may not assume there are not available funds to comply with the provisions of the Bovine Tuberculosis Act which have been appropriated and are now available to both the state of California and the agricultural department of the federal government.

After a careful examination of the entire California Bovine Tuberculosis Act, which we may concede is very drastic and stringent in some respects, we are of the opinion it is constitutional and valid. In support of the act we are mindful of the urgent necessity of regulating, controlling and eliminating dangerous diseases of domestic animals, particularly in dairy cattle for the reason that their milk is among

the most important foods upon which the human race depends. Unhealthy cattle produce impure milk, which is dangerous to those who consume it. Every reasonable precaution should be taken to preserve this valuable food commodity in its purest and most wholesome form. We must assume that veterinarians and other officers who are engaged in the enforcement of this vital and far-reaching act will justly and fairly administer the law, and that they will not arbitrarily or wrongfully oppress the owners of cattle. If they should be guilty of such conduct, the law affords a remedy therefor.

We are of the opinion the demurrers were properly sustained. The judgment is affirmed.

Pullen, P. J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 29, 1938.