[S. F. No. 13708. In Bank.—April 21, 1930.]

A. R. PATRICK, Petitioner, v. RAY L. RILEY, as State Controller, etc., Respondent.

H. C. Nelson, Ralph E. Swing and Frank L. Guerena for Petitioner.

U. S. Webb, Attorney-General, and Alberta Belford and Ralph O. Marron, Deputies Attorney-General, for Respondent.

WASTE, C. J.—This is an original application for a writ of *mandamus* to be directed to the respondent as state controller commanding him to draw two warrants on the state treasurer in the respective sums of $8.46 and $38.28, to which amounts petitioner claims he is entitled by virtue of the provisions of an act of the legislature referred to as the "Bovine Tuberculosis Law." (Stats. 1929, chap. 829, p. 1750.)

Section 10 of the above-entitled act authorizes and empowers the director of agriculture to establish and maintain tuberculosis control areas within the state wherein all dairy animals shall be examined and tuberculin tested. Provision is made for the branding, segregating and slaughtering of all animals reacting positively to the tuberculin test. The section then provides: " . . . in consideration of the fact that the eradication of bovine tuberculosis is beneficial to public health and welfare, that before said animal is branded as provided for in section 9 of this act and/or slaughtered its value shall be determined by appraisement, as provided for herein, . . . ; whereupon the owner of said reacting cattle shall be given a written memorandum signed by or under the authority of said director of agriculture in substance and effect, and in behalf of the State of California, promising that the said state will pay said owner in consideration for the slaughter of said reacting animal, the amount of money herein prescribed therefor. . . ."

The petitioner alleges that the director of agriculture, acting under and pursuant to the terms and provisions of section 10, *supra*, established a tuberculosis control area in the city and county of San Francisco; that the petitioner was the owner of two grade dairy cows located within said area; that on October 16, 1929, the director of agriculture caused said two animals to be examined and tuberculin tested and each reacted positively to the tuberculin test; that they were thereupon branded, appraised and slaughtered; that the director of agriculture thereafter delivered to the petitioner two certain memoranda, as provided in the sec-

tion, each of which read substantially as follows: ''The State of California, by and through the Director of Agriculture of said state, in consideration of the slaughter . . . , pursuant to the terms of Section 10 of the Bovine Tuberculosis Law of California, . . . of one grade dairy animal . . . owned on said date by A. R. Patrick, hereby promises to pay to said owner the sum of [$8.46 and $38.28, respectively]''; that petitioner thereupon, and in form and manner prescribed by law for the presentation, audit and payment of claims against the state, presented the said two claims evidenced by these memoranda to the respondent, as state controller; and that respondent disapproved each of said claims and refused, and still refuses, to draw his warrants therefor.

The refusal of the respondent to draw his warrants in favor of the petitioner is based entirely upon the claim that section 10 of the act, in so far as it authorizes the payment of compensation to the owners of animals slaughtered under its provisions, is in violation of section 31 of article IV of the Constitution, which, so far as material here, declares that the legislature shall not ''make any gift or authorize the making of any gift, of any public money or thing of value to an individual. . . . '' Respondent's position, more specifically stated, is that the legislature might have directed the slaughter of tubercular animals without any compensation under the police power, and that the provision of section 10 of the act for the payment to the owners of certain sums on account of the destruction of their stock is, therefore, a pure gratuity or ''gift,'' within the meaning of the constitutional inhibition. He asserts it to be the settled law of this state that ''an appropriation of public moneys to meet other than a *legal obligation* is violative of section 31, article IV, of the Constitution.'' In support of his contention, respondent quotes the following portion of the decision in *Conlin* v. *Board of Supervisors*, 99 Cal. 17, 21 [37 Am. St. Rep. 17, 21 L. R. A. 474, 33 Pac. 753, 754]: ''The 'gift' which the legislature is prohibited from making is not limited to a mere voluntary transfer of personal property without consideration, which the Civil Code, section 1146, gives as the definition of a gift; but the term, as used in the Constitution, includes all appropriations of public money for which there is no authority or enforceable claim, or which rest upon some moral or equitable obligation, which in the

mind of a generous or even a just individual, dealing with his own moneys, might prompt him to recognize as worthy of some reward. The legislature is to be regarded as holding the public moneys in trust for public purposes, and this limitation of the Constitution is directed against its disposal of these funds except in accordance with such purposes. . . . An appropriation of money by the legislature for the relief of one who has no legal claim therefor must be regarded as a gift within the meaning of that term, as used in this section, and it is none the less a gift that a sufficient motive appears for its appropriation, if the motive does not rest upon a valid consideration.''

■ It is a well-recognized principle that it is one of the first duties of a state to take all necessary steps for the promotion and protection of the health and comfort of its inhabitants. The preservation of the public health is universally conceded to be one of the duties devolving upon the state as a sovereignty, and whatever reasonably tends to preserve the public health is a subject upon which the legislature, within its police power, may take action. That tuberculosis is a dangerous and infectious disease which attacks both human beings and domestic animals; that it is prevalent throughout the state among both human beings and domestic animals; and that it is communicated to human beings, especially to children, by milk and other food products from infected animals, stand undisputed. ■ It cannot be doubted, therefore, that the primal object of the statute here involved is to promote and preserve the public health by providing a means for the control and suppression of this disease among cattle. ■ In providing measures for the protection of public health, the destruction or summary abatement of public nuisances inimical to the public health may be ordered, for all property is held in subordination to the right of its reasonable regulation by the government clearly necessary to preserve the health, safety or morals of the people. (*Kroplin* v. *Truax*, 119 Ohio St. 610, 620–623 [165 N. E. 498, 501, 502]; *Appeal of White*, 287 Pa. St. 259 [53 A. L. R. 1215, 134 Atl. 409].) In other words, health regulations enacted by the state under its police power and providing even drastic measures for the elimination of disease, whether in human beings, crops or cattle, in a general way are not affected by constitutional

provisions, either of the state or national government. (*Lausen* v. *Board of Supervisors,* 204 Iowa, 30, 33 [214 N. W. 682, 684].) ▇▇ In the exercise of the right of eminent domain, private property may not be taken without compensation therefor, whereas, in the exercise of the police power, the use of property may be restricted or it may even be destroyed, and no legal liability arise to compensate the owner therefor. (*Gray* v. *Reclamation Dist.,* 174 Cal. 622, 638 [163 Pac. 1024, 1031]; *Houston* v. *State,* 98 Wis. 481, 486 [42 L. R. A. 39, 74 N. W. 111, 113]; *City of New Orleans* v. *Charouleau,* 121 La. 890 [126 Am. St. Rep. 332, 15 Ann. Cas. 46, 18 L. R. A. (N. S.) 368, 46 South. 911, 912].) In keeping with this doctrine, the case of *Knox County* v. *Kreis,* 145 Tenn. 340, 343 [236 S. W. 1, 2], declares that any provision for the payment to the owner of certain sums on account of the destruction of diseased stock is a pure "gratuity," for "the legislature might have directed the destruction of such animals without any compensation under the police power." (See, also, *State* v. *Heldt,* 115 Neb. 435 [213 N. W. 578]; *Ryder* v. *Pyrke,* 130 Misc. Rep. 505, 508 [224 N. Y. Supp. 289, 294]; *Cory* v. *Graybill,* 96 Kan. 20, 26 [149 Pac. 417, 419].)

While we agree with the respondent's premise that the legislature, in the proper exercise of the police power, might have authorized the destruction of tubercular cattle without making any provision for compensating the owner for the loss thereby incurred, we cannot accept his conclusion, based on these decisions, that a provision for such compensation must, therefore, necessarily fall within the constitutional inhibition against gifts of public moneys because of the absence of any "legal obligation" requiring that such reimbursement be made. The case of *Conlin* v. *Board of Supervisors, supra,* so strongly relied on by respondent, presents nothing that is opposed to our conclusion in this regard. That case had to do with an appropriation of public moneys for a purely *private* purpose, to wit, payment by the city of San Francisco for street work illegally done, and for which no "legal obligation" had theretofore existed. In *City of Oakland* v. *Garrison,* 194 Cal. 298, 301, 302 [228 Pac. 433, 434], this court had occasion to consider the Conlin case, and, after pointing out that the statement of the law therein appearing was sufficiently accurate and comprehensive for all the pur-

poses of the case which was then before the court for consideration, concluded that ''That case involved the single question of the power of the legislature to authorize and direct a municipality to make a payment of public moneys from the city treasury to a private individual who had no valid or enforceable claim against the city therefor. There was no claim or suggestion that the moneys so directed to be paid were to be devoted to any public purpose. On the contrary, it was contemplated and intended that they should be paid to the private individual for his sole use and benefit. There was not and could not be in that case any question whether the proposed appropriation of public funds was for a private or public purpose. The purpose thereof was necessarily and admittedly private and this court held that such a use of public funds would constitute a gift such as is prohibited by the Constitution. In other decisions, both prior and subsequent to the Conlin case, *supra,* this court has pointed out that where the question arises as to whether or not a proposed application of public funds is to be deemed a gift within the meaning of that term as used in the Constitution, the primary and fundamental subject of inquiry is as to whether the money is to be used for a public or a private purpose. If it is for a public purpose within the jurisdiction of the appropriating board or body, it is not, generally speaking, to be regarded as a gift. . . . ''

██ That the act here in question was enacted for a public purpose is beyond question and, being a law for the suppression of disease and the promotion of the public health, it should be given a broad and liberal construction that it may accomplish the purpose intended in enacting it. (*Schulte* v. *Fitch,* 162 Minn. 184, 188–191 [202 N. W. 719, 721, 722] ; *Lausen* v. *Board of Supervisors, supra.*) In construing such an act, the courts must presume that the legislature has carefully investigated and has properly determined that the interests of the public require legislation that will insure the public safety and the public health against threatened danger from diseased animals. The determination of that fact is the province of the legislature, and not of the courts. It is also the province of the legislature, in the exercise of a sound discretion, to determine what measures are necessary for the protection of such interests. (*Application of Miller,* 162 Cal. 687, 696 [124

Pac. 427, 429]; 5 Cal. Jur. 719, sec. 122; *Durand* v. *Dyson,* 271 Ill. 382, 391 [Ann. Cas. 1917D, 84, 111 N. E. 143, 146]; *Lausen* v. *Board of Supervisors, supra; State* v. *Heldt, supra.*) ■ We are not prepared to say that the legislature in this act has abused its discretion, or that the measures it has adopted, including the provision for compensation, to prevent the spread of tuberculosis among cattle are unnecessary and unreasonable or in violation of section 31 of article IV of the Constitution.

The question of policy which, no doubt, animated the legislature is discussed in 2 Tiedeman on State and Federal Control of Persons and Property, where, at page 828, it is said: ''The power of the state to destroy property, in order to prevent the spread of disease, has been most actively resisted in the case of diseased animals. This determined resistance to such regulations may be occasioned, either by the greater value of the property so destroyed, or by the absence of a popular conviction that the destruction of the diseased animals is necessary to the preservation of the public health. . . . Many owners of such herds of cattle, perhaps the majority of them, blinded by their own pecuniary loss, when for this cause and reason their valuable cattle are destroyed, repudiate the medical theories upon which the act of destruction is based, and by which it is justified, and consider it a wanton and unjustifiable taking of private property. . . . '' It is not unreasonable to conclude that a provision looking to the compensation of the owners of cattle slaughtered under the police power will accomplish much in the way of precluding or dissipating their opposition and resistance to the proper and immediate enforcement of such legislation, thereby directly tending to foster and promote the public purpose for which it was enacted. The question whether the public interests of the state would be at all advanced by compensating the owners of cattle destroyed under the provisions of the ''Bovine Tuberculosis Law'' was an appropriate one for discussion and determination by the legislature before its enactment. As indicated in the case of *City of Oakland* v. *Garrison, supra,* at page 302, the fundamental test of the constitutionality of a statute requiring the use of public funds is whether the statute is designed to promote the public interests, as opposed to the furtherance of the advantage of individuals; and such a statute should not be declared uncon-

stitutional because of the fact that, incidental to the main purpose, there results an advantage to individuals. (*Veterans' Welfare Board* v. *Jordan*, 189 Cal. 124, 140, 141 [22 A. L. R. 1515, 208 Pac. 284, 291, 293].)

It is our conclusion, therefore, that while the legislature, in the exercise of the police power, might have directed the slaughter of diseased cattle without making any provision for compensation to the owners, it did not violate section 31 of article IV of the Constitution by refusing to exert the full measure of its might. "Necessity alone is not the test by which the limits of state authority in this direction are to be defined, but a wise statesmanship must look beyond the expenditures which are absolutely needful to the continued existence of organized government, and embrace others which may tend to make that government subserve the general well-being of society, and advance the present and prospective happiness and prosperity of the people." (*Stephens* v. *Chambers*, 34 Cal. App. 660, 668, 669 [168 Pac. 595, 598, 599].) In the case of *Chambers* v. *Gilbert*, 17 Tex. Civ. App. 106 [42 S. W. 630], the court had under consideration an act of the legislature providing among other things, compensation from county funds for the slaughter of diseased animals. Section 52 of article III of the Constitution of Texas provided: "The legislature shall have no power to authorize any county, city, town, or other political corporation, or subdivision of the state, to lend its credit or to *grant public money* or thing of value, in aid of or to any individual. . . . " After declaring that the legislature, in the exercise of the police power, might well provide for the condemnation and destruction of diseased animals, the court concluded that there was nothing in section 52 of article III of the Constitution of that state which prohibited the legislature from providing for the payment of compensation from county funds. The payment of such compensation was, in effect, held not to constitute a gift or "grant" of public moneys to an individual. (See, also, the later case of *Kilpatrick* v. *Compensation Claim Board*, (Tex. Civ. App.) 259 S. W. 164, 167.)

This court has, upon other occasions, sustained the constitutionality of legislation involving the expenditure of public funds because of the public purpose thereby subserved, and this, despite the fact that such expenditures

tended to the incidental advantage of individuals to whom the state was under no "legal obligation" to do benefit. By way of illustration, we refer to the cases of *MacMillan Co.* v. *Clarke,* 184 Cal. 491 [17 A. L. R. 288, 194 Pac. 1030] (providing for the furnishing of free text-books to high school pupils); *Pasadena High School Dist.* v. *Upjohn,* 206 Cal. 775 [63 A. L. R. 408, 276 Pac. 341, 344] (providing free transportation for high school pupils); *Allied Architects' Assn.* v. *Payne,* 192 Cal. 431 [30 A. L. R. 1029, 221 Pac. 209] (providing for a memorial hall for the use of veteran soldiers and sailors); *Veterans' Welfare Board* v. *Jordan, supra* (providing for a bond issue to carry out the provisions of the Veterans' Farm and Home Purchase Act, etc.). Respondent attempts to distinguish the present case from those above enumerated upon the ground that the public purpose involved in each of the cited cases was furthered by the expenditure of public funds, whereas, in the present case, the public purpose will not in any manner be "effected, aided or furthered by an expenditure of public moneys." We have already indicated that the determination of this question was within the legislative province, and its solution thereof, which cannot be said to be unreasonable or illusory, tends to refute the respondent's argument. There would, perhaps, be merit in respondent's point if this were a case where the legislature had undertaken to vote compensation retrospectively to the owners of diseased cattle destroyed prior to the enactment of the statute.

In passing, it should be said that many, if not the majority, of the statutes we have examined providing for the destruction of diseased cattle, contain provisions for the compensation of the owners of animals destroyed thereunder. This is true of the acts considered in *Cory* v. *Graybill, supra; Knox Co.* v. *Kreis, supra; Chambers* v. *Gilbert, supra; Durand* v. *Dyson, supra; State* v. *Jones,* 196 Wis. 464 [220 N. W. 373]; *Albright* v. *Board of Commrs.,* 108 Kan. 184 [194 Pac. 913]; *Peverill* v. *Board of Supervisors,* 201 Iowa, 1050, 1057 [205 N. W. 543, 546]; *Kroplin* v. *Truax, supra,* and *State* v. *Splittgerber,* (Neb.) 229 N. W. 332.

We have experienced no embarrassment in arriving at the conclusion herein announced, because of the fact that the legislature, apparently out of an abundance of caution, saw fit to propose to the people the addition of a new section

to article IV of the Constitution, to be numbered 31a, and to read: "No provision of this Constitution shall be construed as a limitation upon the power of the legislature to provide by general law, from public moneys or funds, for the indemnification of the owners of livestock taken, slaughtered or otherwise disposed of pursuant to law and to prevent the spread of a contagious or infectious disease; provided, the amount paid in any case for such animal or animals shall not exceed the value of such animal or animals." (Stats. 1929, p. 2176.) The proposed constitutional amendment, has not, as yet, been voted upon by the people. This court, in the absence of a constitutional amendment authorizing the furnishing of free text-books to high school pupils, sustained the constitutionality of a legislative enactment so providing (*MacMillan Co.* v. *Clarke, supra*), even though a constitutional amendment adopted in 1912 expressly provided for the furnishing of such books to the pupils of the *elementary* schools only.

For the foregoing reasons, the respondent's demurrer to the petition is overruled, and the writ is made peremptory.

Shenk, J., Richards, J., Seawell, J., Preston, J., and Curtis, J., concurred.