[Civ. No. 15584. Second Dist., Div. One. Mar. 10, 1947.]

RITA GORDON, Appellant, v. BOARD OF EDUCATION OF THE CITY OF LOS ANGELES et al., Respondents; LOUISE H. PEPPIN et al., Interveners.

George S. Gordon for Appellant.

Harold W. Kennedy, County Counsel and Wm. E. Lamoreaux, Deputy County Counsel, for Respondents.

Herbert Ganahl, Joseph Scott, J. Howard Ziemann, Dock-weiler & Dockweiler, Thomas A. J. Dockweiler, Gibson, Dunn & Crutcher, Henry F. Prince, Joseph L. Lewinson and Thomas S. Bunn for Interveners.

DRAPEAU, J. pro tem.—Section 8286 of the Education Code was added to our laws by legislative enactment in 1943. This section provides that pupils, with the written consent of their parents, may be excused from schools to participate in religious exercises or to receive moral and religious instruction. Upon complying with the provisions of the statute such absences are not counted in computing average daily attendance. However, allocations of state and county school funds are based upon average daily attendance.

The Board of Education of the City of Los Angeles adopted regulations setting up a plan of compliance with the statute, as follows: An Interfaith Committee composed of representatives of various religious denominations was to act as coordinating agent for the denominations participating in the plan. There were a number of such denominations so represented, including Catholics, those of the various Protestant faiths, and Jews.

At the request of the Interfaith Committee the Board of Education caused to be sent to parents of pupils in the Los Angeles schools literature describing the plan, and cards for the parents to return to the board. These cards contained a form for the parents to sign, consenting that the children take part in the plan, and designating the faith they were to be taught. The expense of preparation, printing or mimeographing, and mailing of the literature and cards was paid by the school system. Teachers and superintendents of schools were directed to keep attendance records and to oversee the working of the plan.

As the plan operates, children are segregated according to the preferences expressed by their parents regarding religious instruction, transported from the school grounds to places arranged for by the Interfaith Committee, and there taught the doctrine of the church to which they have been assigned. Expenses of transportation are not paid by the school system, nor are the officers of the schools in charge of the children during their absence from school. Children not participating in the program remain in school and such teaching as they

receive is optional with their teachers. This project, sponsored by the religious leaders, the parents and educational authorities of the county of Los Angeles may be denominated the "released-time plan."

Petitioner is a taxpayer, and applied to the superior court for a writ of mandate to compel the Board of Education to discontinue the released-time plan. The petition alleged that the statute is void because it is in contravention of the Constitution of California, and that the released-time plan as carried on in Los Angeles violates not only the Constitution and laws of the state but also the Constitution of the United States. The trial court found against petitioner, denied the petition, and the case is now before this court on appeal.

The primary question for decision here is whether the operation of the released-time plan in Los Angeles under section 8286 of the Education Code is unconstitutional.

Section 4 of article I of the Constitution of California provides that: "The free exercise and enjoyment of religious profession and worship without discrimination or preference, shall forever be guaranteed in this State; . . ."

Section 8 of article IX prohibits the appropriation of any public money for the support of any sectarian or denominational school, "nor shall any sectarian or denominational doctrine be taught, or instruction thereon be permitted, directly or indirectly, in any of the common schools of this state."

Section 30 of article IV prohibits appropriations or the granting of anything "in aid of any religious sect, church, creed, or sectarian purpose."

The first amendment to the federal Constitution, applicable to all the states by the fourteenth amendment, provides that: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

These sections of our California Constitution have been considered and applied in several cases in this state involving school affairs.

In *Evans* v. *Selma Union High School District* (1924), 193 Cal. 54 [222 P. 801, 31 A.L.R. 1121], the Supreme Court of California held that the purchase of a King James version of the Bible by a school board for library and reference purposes is not prohibited by our law. In that case the Supreme Court observed that there is nothing objectionable in the use of religious books in our schools. To be objectionable such books

must be "sectarian, partisan, or denominational in character." And the words "sectarian" and "denominational" are defined: " 'Sect,' strictly defined, means 'a body of persons distinguished by peculiarities of faith and practice from other bodies adhering to the same general system' (Standard Dictionary), and 'denominational' is given much the same definition. But the term 'sect' has frequently a broader signification, the activities of the followers of one faith being regarded as sectarian as related to those of the adherents of another."

In this connection we find the following comment in 11 California Law Review, 187:

"The problem of defining the word 'sectarian' has come before the courts of other jurisdictions in a number of cases. The rulings of the courts vary with the theory adopted as to the purpose of such provisions. Are they intended to secularize state activity, particularly in the schools, or merely to prevent discriminatory religious instruction, leaving room for teaching of moral precepts and of the generally accepted fundamentals of religion, and certainly permitting literary and historical uses? Only one state, Washington, unequivocally declares its purpose as complete secularization of school instruction. One other state, Illinois, reaches this result by judicial construction of the usual prohibitions as to using public money for sectarian purposes. Two states, Nebraska and Wisconsin, hold that it is not impossible to use the Bible or parts of it in connection with school work, although the facts presented to the courts in each case were found to show that the use which had been made was sectarian. The leading Michigan decision, *Pfeiffer* v. *School Board* (118 Mich. 560, 77 N.W. 250 [42 L.R.A. 536]), may imply a similar theory, since it concerned the use of a book of moral excerpts embodying moral principles set forth in the Bible. Michigan is, however, generally regarded as aligned with Kentucky, Georgia, Maine, Texas, Massachusetts, Kansas, and Iowa in regarding the use of the Bible in the King James translation as non-sectarian, even when this use extended to daily readings made part of the school exercises."

In *Bowker* v. *Baker* (1946), 73 Cal.App.2d 653 [167 P.2d 256], the District Court of Appeal of California held that section 16257 of the Education Code does not infringe constitutional prohibitions against appropriation of public funds in aid of religious sects or in support of denominational

schools. This section authorizes the governing board of any school district to transport pupils attending private schools in school busses.

Also in this case the function of the judicial power in passing upon the constitutionality of legislative enactments is commented upon and the rule quoted from *People* v. *Standard Accident Ins. Co.*, 42 Cal.App.2d 409 [108 P.2d 923, 926]:

"And in considering the constitutionality of the statute the question presented is not whether it is possible to condemn it, but whether it is possible to uphold it. It is not to be declared invalid, because, incidental to the main purpose, there results an advantage to individuals. (*Patrick* v. *Riley*, 209 Cal. 350 [287 P. 455].) The Legislature is vested with a large discretion in determining what is for the public good and what are public purposes for which public moneys can be rightfully expended and that discretion connot be controlled by the courts except, when its action is clearly evasive. (*Daggett* v. *Colgan*, 92 Cal. 53 [28 P. 51, 27 Am.St.Rep. 95, 14 L.R.A. 474].)"

In *Bowker* v. *Baker, supra,* a number of cases relative to furnishing of transportation by public school authorities to pupils of sectarian schools are cited; and some of them are analyzed. And the reasoning underlying the cases holding this practice to be lawful is summed up as follows: (p. 661)

"The general line of reasoning running through those cases which uphold the right of the school district to provide free transportation for school children finds its starting point in the undoubted police power of the state to promote the public welfare by aiding in practical ways the education of the young. It is generally held that the direct benefit conferred is to the children with only an incidental and immaterial benefit to the private schools; that this indirect benefit is not an appropriation of public moneys for private purposes and does not violate any constitutional provisions against giving State aid to denominational schools."

And also in *Bowker* v. *Baker, supra,* the court finds support for its decision in a number of California cases holding that the Veterans Educational Act (Stats. 1921, ch. 579, p. 967) is constitutional. This act authorized the state to pay for the education of qualified veterans of the first world war in private schools when suitable facilities are not available in public or semipublic institutions, and also to pay for transportation of said veterans to such private schools.

And finally, in *Bowker* v. *Baker, supra,* the court restates another rule binding upon us in determining the constitutionality of the legislative enactment now under attack.

"In *University of Southern California* v. *Robbins, supra,* (1 Cal.App.2d 523 [37 P.2d 163, 164]), it was said:

" 'If the subject-matter of the legislation is of such a nature that there is any doubt of its character, or if by any possibility the legislation may be for the welfare of the public, the will of the legislature must prevail over the doubts of the court.' (*In re Madera Irr. Dist.,* 92 Cal. 296 [28 P. 272 . . . 14 L.R.A. 755]. . . .)"

Research by counsel and the court fails to find any California case in which the released-time plan has been considered. There are two cases involving the operation of the released-time plan in New York. And New York's constitutional provisions and statutes forbidding state aid to sectarian institutions are similar to ours.

In *Stein* v. *Brown* (1925), 125 Misc. 692 [211 N.Y.S. 822], the trial court of Westchester County, New York, held that the furnishing of cards for a released-time plan of religious education by the Board of Education violated constitutional provisions prohibiting the use of public funds or property to aid denominational schools.

But, in *People ex rel. Lewis* v. *Graves* (1927), 245 N.Y. 195 [156 N.E. 663], a contrary conclusion was reached by the Court of Appeals upon substantially the same facts. In commenting upon these decisions in 141 American Law Reports 1151, it is said:

"So far as appears, the only difference between the facts in the two cases is that whereas in the later case the cards upon which the parents of the pupils were to give their consent to the outside religious instruction of their children were furnished by agencies other than the school authorities, in the earlier case such cards were printed by the pupils as an exercise on materials furnished at the expense of an outside agency."

The Graves case was first heard by the trial court of Albany County, New York, in April of 1926, and the application for mandate denied. (*People* v. *Graves,* 127 Misc. 135 [215 N.Y.S. 632].) Upon appeal to the Appellate Division of the Supreme Court (a five judge intermediate court of appeals) the ruling of the trial court was affirmed with the following remark:

"The State by its educational policy seeks to build from its youth useful citizens of intelligence and character, not merely pedants and philosophers. In following this policy it should not only consider the wishes, but invite the aid, of parents. When the wish of parents for weekday religious instruction for their children involves no serious interruption to school attendance, the state can have no purpose to defeat it. If local school authorities render their assistance by methods so innocuous as those detailed here, it does not amount to illegality. Reasonableness in the method adopted is the test of such legality. Neither the local school officers nor the commissioner of education have here violated that rule." (*People* v. *Graves*, 219 App.Div. 233 [219 N.Y.S. 189, 196].)

In finally deciding the case (*People ex rel. Lewis* v. *Graves, supra*) the Court of Appeals, which is the court of last resort of the State of New York, states:

"Neither the Constitution nor the law discriminates against religion. Denominational religion is merely put in its proper place outside of public aid for support. As a matter of educational policy, the commissioner doubtless may make proper regulations to restrict the local authorities when the administration of the plan of week-day instruction in religion or any plan of outside instruction in lay subjects in his judgment interferes unduly with the regular work of the school.

"The separation of the public school system from religious denominational instruction is thus complete. Jealous sectaries may view with alarm the introduction in the schools of religious teaching which to the unobservant eye is but faintly tinted with denominationalism. Eternal vigilance is the price of constitutional rights. But it is impossible to say, as matter of law, that the slightest infringement of constitutional right or abuse of statutory requirement has been shown in this case."

Thus it is to be observed that the trial court, the Appellate Division, and the Court of Appeals, the highest court of the State of New York (of which one of its members was the late Mr. Justice Benjamin N. Cardozo), were unanimous in upholding the constitutionality of a statute similar to ours of California and its application to a released-time plan of religious education in the New York school system.

Similar cases have involved the attention of the Illinois courts.

In Chicago, Illinois, for the past sixteen years pupils have been excused by the school board for one hour a week to attend classes in religious instruction. What was done is described in *People ex rel. Latimer* v. *Board of Education* (1946), 394 Ill. 228 [68 N.E.2d 305, 309]. The decision in *People ex rel. Lewis* v. *Graves, supra,* is approved and followed by the Supreme Court of Illinois. In commenting upon this application of the released-time plan, the Illinois court says:

"The school authorities in Illinois and in every jurisdiction in the United States have always been vested with discretionary power to determine what constitutes a sufficient excuse for absence from school, and the court should not interfere or attempt to control the exercise of such power, unless it has been substantially abused. The regulation complained of does not do violence to the compulsory attendance law and in our judgment is a reasonable rule for the practical administration of the public schools.

"In the examination of the constitutional provisions cited by the appellants, and admitting all the facts well pleaded in the mandamus petition to be true, we do not find any constitutional or statutory violence by the board of education in this case."

In the latest Illinois case, *People ex rel. McCollum* v. *Board of Education,* 396 Ill. 14 [71 N.E.2d 161], decided by the Supreme Court of Illinois, January 22, 1947, classes were held in the public schools once each week. Teachers were supplied by religious denominations. Cards were used as in the California released-time plan. Separate rooms were provided for Catholics, Jews and Protestants, and for those pupils who did not desire to take part in the plan. Objections to this plan were presented by petition for mandate, upon the same legal grounds urged in the pending case, with the additional one that the classes were held in public school buildings. The Illinois Supreme Court followed its prior decision in *People ex rel. Latimer* v. *Board of Education, supra.* In discussing the use of public funds in aid of the plan as applied in this case, the court observes:

"In the case of *Nichols* v. *School Directors,* 93 Ill. 61 [34 Am.Rep. 160], this court held that permission to hold stated meetings for religious purposes in the schoolhouse did not compel a taxpayer to aid in supporting a house of worship in

violation of the above constitutional restraints. As the court there aptly said, 'It seems to us a very strained interpretation to attempt to bring the present case within the reach of either one of the above constitutional provisions.' The court there further said, 'Religion and religious worship are not so placed under the ban of the constitution that they may not be allowed to become the recipient of any incidental benefit whatsoever from the public bodies or authorities of the State.' This decision has been cited and followed by this court in a number of cases. It is our judgment the incidental expenses that might occur here are not in violation of the constitutional restraints insisted upon.''

Whether the plan conflicts with federal and state guaranties of religious freedom is also commented upon as follows:

''We have the record here, which, relieved of its excess verbiage, technicalities and niceties, presents the simple question, does either the Federal or State constitution, or both, in their guaranty of religious freedom, prohibit voluntary religious classes in the public schools under the plan as disclosed by this record? Certainly, such classes do not violate the freedom of conscience of any individual or group so long as the classes are conducted upon a purely voluntary basis. Freedom of religion as intended by those who wrote the State and Federal Constitutions means the right of an individual to entertain any desired religious belief without interference from the State. Our government very wisely refuses to recognize a specific religion, but this cannot mean that the government does not recognize or subscribe to religious ideals. We find such recognition in the very preamble of our State constitution. The government does not recognize a particular faith but this does not mean that it is indifferent to religious faith. To deny the existence of religious motivation is to deny the inspiration and authority of the constitution itself.''

This then brings us to a consideration of the California constitutional provisions and their application to the case at bar. Reference to the debates of the constitutional convention which presented the Constitution of 1879 to the people of California demonstrates that there was no thought whatsoever in the minds of the framers of that document in opposition to or of hostility to religion as such. They proposed to insure separation of church and state, and to provide that the power and the authority of the state should never be devoted to the

advancement of any particular sect or denomination. Our pioneer forefathers did not have the remotest idea that they were laying the foundations of the great Commonwealth of California that was to be as a jejune, godless state; they believed one of the great pillars of our national strength to be the general acceptance of religion by our people.

Proceedings of the California State Convention of 1878 are not well indexed. Section 30 of article IV was reported to the convention December 23, 1878, as section 37 (p. 189). Upon the presentation of the section and throughout the convention there was debate upon amendments to permit allocation of public funds to orphanages maintained by religious organizations. One of these amendments was finally adopted. (Pp. 1252-1254-1259-1264-1265-1266-1272-1273.)

The policy of the American people in the inclusion of similar provisions in most of our state constitutions is well described in Bryce's "The American Commonwealth," Volume 2, page 767:

"The abstention of the State from interference in matters of faith and worship may be advocated on two principles, which may be called the political and the religious. The former sets out from the principles of liberty and equality. It holds any attempt at compulsion by the civil power to be an infringement on liberty of thought, as well as on liberty of action, which could be justified only when a practice claiming to be religious is so obviously anti-social or immoral as to threaten the well-being of the community. Religious persecution, even in its milder forms, such as disqualifying the members of a particular sect for public office, is, it conceives, inconsistent with the conception of individual freedom and the respect due to the primordian rights of the citizen which modern thought has embraced. Even if State action stops short of the imposition of disabilities, and confines itself to favouring a particular church, whether by grants of money or by giving special immunities to its clergy, this is an infringement on equality, putting one man at a disadvantage compared with others in respect of matters which are (according to the view I am stating) not fit subjects for State cognizance.

"The second principle, embodying the more purely religious view of the question, starts from the conception of the church as a spiritual body existing for spiritual purposes and moving

along spiritual paths. It is an assemblage of men who are united by their devotion to an unseen Being, their memory of a past divine life, their belief in the possibility of imitating that life, so far as human frailty allows, their hopes for an illimitable future. Compulsion of any kind is contrary to the nature of such a body, which lives by love and reverence, not by law. It desires no State help, feeling that its strength comes from above, and that its kingdom is not of this world. It does not seek for exclusive privileges, conceiving that these would not only create bitterness between itself and other religious bodies, but might attract persons who did not really share its sentiments, while corrupting the simplicity of those who are already its members. Least of all can it submit to be controlled by the State, for the State, in such a world as the present, means persons many or most of whom are alien to its beliefs and cold to its emotions. The conclusion follows that the church as a spiritual entity will be happiest and strongest when it is left absolutely to itself, not patronized by the civil power, not restrained by law except when and in so far as it may attempt to quit its proper sphere and intermeddle in secular affairs.''

No one who keeps pace with the trends of modern society can deny that instruction of the youth of the state in faith and morality is of utmost necessity and importance. All too regretfully it must be said that in present-day American life the family as a unit has not done its part in this vital field of education of our boys and girls. Else juvenile courts would not be groaning under an avalanche of cases of derelictions of children. What more logical advance could be made in the science of sociology than the unification of religious leaders in a coordinated effort to teach children faith and morality— and for that purpose to excuse them from schools for one hour a week to go to the church or tabernacle or synagogue of their parents' choice?

Description of the released-time plan demonstrates it to be nonsectarian and not in violation of section 4 of article I of our Constitution, nor of the Constitution of the United States.

''Laws in aid of religion, which do not establish a particular religion or prohibit the free exercise of religion or give a preference to a particular religion or mode of worship, are consistent with the constitutional guaranties of religious liberty and freedom of conscience. (*Garrett Biblical Institute*

v. *Elmhurst State Bank,* 163 N.E. 1, 331 Ill. 308.) Statutes providing for the incorporation of religious societies, without discrimination, preference or restriction do not violate the guaranties of religious liberty and freedom of conscience." (*Terrett* v. *Taylor,* 9 Cranch (U.S.) 43 [3 L.Ed. 650]; 12 C.J. 945, n. 5; 16 C.J.S. 601.)

Again, research by counsel and the court fails to find any case in the United States Supreme Court directly in point. But there are two cases in that court which are helpful in determining the constitutional questions here involved. In *Cochran* v. *Louisiana State Board of Education* (1929), 281 U.S. 370 [50 S.Ct. 335, 74 L.Ed 913], it is held that the furnishing by a Louisiana School Board of secular text books without charge to private religious sectarian and other schools does not constitute aid to religion in violation of the fourteenth amendment to the federal Constitution. "Its interest is education, broadly; its method, comprehensive. Individual interests are aided only as the common interest is safeguarded." (74 L.Ed. 915.)

In *Everson* v. *Board of Education of Ewing Tp.* (1947), —— U.S. —— [67 S.Ct. 504, 91 L.Ed. ——], it is held that the transportation of children to Catholic parochial schools by the state is not contrary to the first amendment to the United States Constitution or any prohibition against the use of public funds in aid of such schools. In this five-to-four decision by the Justices of the Supreme Court many pages in the main opinion and the dissenting opinions are given to a review of the American doctrine of separation of church and state. The decision is based upon a determination by the court:

(a) That the far-reaching authority of the United States Supreme Court to strike down state statutes on the ground that the purpose for which tax-raised public funds were to be expended was not a public one, must be exercised with the most extreme caution, and,

(b) That the State of New Jersey has the right to pay out of public moneys fares of pupils attending parochial schools, because it is a part of a general program under which the state pays fares of all pupils attending both public and private schools.

Measured by the standards set forth in the foregoing authorities, in the operation of the released-time plan in Los

Angeles, there is no appropriation of public money in support of any sect or denomination and no teaching of sectarianism in the school system of Los Angeles County in violation of section 8 of article IX of the California Constitution.

And neither the California law nor the Los Angeles released-time plan is prohibited by section 30 of article IV.

In addition to the constitutional questions appellant complains of rulings by the trial court excluding evidence of sectarian antagonism and ill feeling resulting from the conduct of the plan, and appellant presents several specifications of error of the trial court in finding or failing to find certain facts from the evidence. Whatever may have been the result of the application of the released-time plan is a matter of discretion of the Board of Education with which, in this case at least, the courts have nothing to do. From the findings as a whole, no error is apparent.

The judgment is affirmed.

York, P. J., concurred.

WHITE, J.—I concur with the foregoing opinion and the reasoning supporting it.

That the legislation which gave rise to this proceeding is not in the remotest degree tinged with sectarianism or denominationalism is attested by the fact that arrayed in defense of the constitutionality of the challenged Education Code section are parents whose children, under the Released Time Religious Educational Program, are being instructed in the Jewish, various Protestant, and Roman Catholic religious faiths.

Throughout her entire argument, appellant misconceives the American principle of religious freedom. What she contends for is freedom *from* religion rather than freedom *of* religion. Appellant's argument leads one to the conclusion that the doctrine of separation of church and state looks upon religion as something intrinsically evil, and against which there should be a rigid quarantine. Nothing is farther from the true concept of the American philosophy of government than such an argument. In the constitution of every state of the union is to be found language which either directly, or by clear implication, recognizes a profound reverence for religion and an assumption that its influence in all human affairs is essential to the well-being of the community. The preamble of the Constitution of the State of California says:

"We, the People of the State of California, *grateful to Almighty God* for our freedom, in order to secure and perpetuate its blessings, do establish this Constitution." (Emphasis added.) As was so cogently stated by the United States Supreme Court in the case of *The Rector, etc., Church of The Holy Trinity* v. *United States,* 143 U.S. 457 (12 S.Ct. 511 [36 L.Ed 226]): ". . . no purpose of action against religion can be imputed to any *legislation,* State or Nation, because *this is a religious people."* (Emphasis added.) And again, in the same case, after offering historical proof in support of the language just quoted, the court says: "There is no dissonance in these declarations. There is a universal language pervading them all, having one meaning; they affirm and reaffirm that this is a religious nation. These are not individual sayings, declarations of private persons; they are organic utterances; they speak the voice of the entire people."

That ours is a religious nation is historically true from the discovery of this continent to the present hour. Coming down to our own Declaration of Independence we find a recognition of Almighty God in the words: "We hold these truths to be self-evident: that all men are created equal; that they are *endowed by their Creator* with certain unalienable rights; that among these are life, liberty and the pursuit of happiness." Also, in the same document we read:

"We, therefore, the representatives of the United States of America, in General Congress assembled, appealing to *the Supreme Judge of the world* for the rectitude of our intentions, do, in the Name and by Authority of the good people of these colonies, solemnly publish and declare," etc. And in bringing this immortal charter of liberty to a close, the signers thereof, "with a firm reliance on the protection of *Divine Providence,"* mutually pledged their lives, fortunes, and sacred honor to the end that, as President Lincoln said in that military cemetery at Gettysburg, there might be "brought forth on this continent, a new nation, conceived in liberty, and dedicated to the proposition that all men are created equal." In further proof that this is essentially a religious nation we have the form of oath universally prevailing in our courts and concluding with an appeal to Almighty God. And here I pause to recall the admonition of President George Washington in his Farewell Address when he cautioned us:

"Of all the dispositions and habits, which lead to political prosperity, religion and morality are indispensable supports.

In vain would that man claim the tribute of patriotism, who should labor to subvert these great pillars of human happiness, these firmest props of the duties of men and citizens. The mere politician, equally with the pious man, ought to respect and to cherish them. A volume could not trace all their connexions with private and public felicity. Let it simply be asked, *Where is the security for property, for reputation, for life, if the sense of religious obligation desert the oaths, which are the instruments of investigation in Courts of Justice? And let us with caution indulge the supposition, that morality can be maintained without religion. Whatever may be conceded to the influence of refined education on minds of peculiar structure, reason and experience both forbid us to expect, that national morality can prevail in exclusion of religious principle.*"

In addition, we have the custom of opening the Congress of the United States, and State Legislatures, with prayer for divine guidance; the prefatory words so prevalent in wills, "In the Name of God, Amen"; exemption of churches from taxation; and the closing of our courts, Legislatures and similar public assemblages and public offices in observance of the Sabbath day. In the face of all these, shall it be believed or said that the Constitution of this state operates to make void legislation, the effect of which is to promote religion? While eternal vigilance is yet the price of constitutional rights, a long line of cases establishes as a fact that neither the Constitution nor the law discriminates against religion. It is denominational religion that is placed outside of public aid or support.

History, both ancient and modern, bears striking witness to the inevitable fate that has befallen peoples whose government has engaged in undermining or destroying belief in the existence of God and attempted to replace Him with idols, either in the form of a man, groups of men, or of the state. Inalienable, natural rights of every kind disappeared and the individual became but the pawn and chattel of the state, stripped of any rights, privileges or guaranties except such as might be conferred upon him by the state—a veritable system of ignominious slavery.

The essence of the Released Time Religious Education Program (Ed. Code, § 8286) is to authorize governing boards of school districts, within their discretion, to permit pupils to be

excused from school at the request of their parents for the purpose of attending classes of religious instruction maintained and operated by religious faiths of their own choosing. Examination of the statute reveals nothing opposed to the constitutional guarantee insuring religious liberty, freedom of conscience and preventing the establishment of a particular religion. The code section in question does not in any way interfere with religious freedom. It does not work an establishment of religion, provide for compulsory support, by taxation or otherwise, of religious instruction, make attendance upon religious worship compulsory, work a restriction upon the exercise of religion according to the dictates of conscience, or impose restrictions upon the expression of religious belief.

The California Released School Time Religious Education Program authorized by section 8286 of the Education Code, is not new in the United States. Either by express statutory provisions, court decisions, rulings of the State Attorneys General, or opinions of state boards of education or Chief State School Officers, forty states authorize the release of public school pupils for weekly religious education classes. And it is noteworthy that no appellate court of any state has held such programs unconstitutional. In both the States of New York and Illinois judicial attacks have been made upon the released time programs on identical grounds as the attack in the instant case, to wit, that the plans violated the constitutional guarantees of freedom of religion and were in aid of a religious purpose. Because of the similarity of the facts and of the constitutional provisions in those cases and the ones involved in the case with which we are here concerned, the decisions of those courts are persuasive and entitled to great weight. I refer to the cases of *People ex rel. Lewis* v. *Graves,* 245 N.Y. 195 [156 N.E. 663, 664] ; *People ex rel. Latimer* v. *Board of Education,* 394 Ill. 228 [68 N.E.2d 305] ; and *People ex rel. McCollum* v. *Board of Education* (396 Ill. 14 [71 N.E.2d 161]).

Under our California statute, no particular denomination or religious faith is favored, no part of the religious instruction is held in the schoolroom on school property, and no one is required to attend. To act in accordance with his lack of religion is the right of the man of no religion, but he has no right to insist that others shall have no religion.

The recent California case of *Bowker* v. *Baker,* 73 Cal.App. 2d 653 [167 P.2d 256], is a complete answer to appellant's

contention that the Released Time Religious Education Program violates the provisions of article IV, section 30, or article IX, section 8, prohibiting the granting by the state of anything in aid of any sectarian purpose. In the case just cited, after an exhaustive review of many cases, the court says:

"While these cases do not directly touch on the main question before us they do support the theory that where the main purpose of an enactment is lawful, and an incidental or immaterial benefit results to some person or organization, which benefit is not directly permitted by law, this incidental benefit alone will not defeat the legislation, its main purpose being lawful. . . .

"If the transportation of pupils to and from public schools is authorized, as it certainly is, and if the benefit from that transportation is to the pupils, then an incidental benefit flowing to a denominational school from free transportation of its pupils should not be sufficient to deprive the Legislature of the power to authorize a school district to transport such pupils."

The true and essential purpose of the American doctrine of separation of church and state is to protect people in the fullest enjoyment of religious freedom and to forestall compulsion by law of the acceptance of any creed or the practice of any particular form of worship, but the decisions in both the federal and state courts furnish unmistakable authority for the proposition that the doctrine of separation of church and state does not mean that there is any conflict between religion and state in this country or any disfavor of any kind upon religion as such.

Appellant's argument also ignores the long established doctrine in the United States that the alien philosophy that the child is the creature of the state finds no countenance in the American system of government (*Boens* v. *Bennett,* 20 Cal. App.2d 477, 482 [67 P.2d 715]). Under our system of government the family is the foundation of the social order, it does not spring from the state but the state springs from the family. The parents, unless their parental authority has been taken away by the courts, are the ones to decide the extent and character of the education of their children, beyond what is provided by the school system of the state. As was said by the United States Supreme Court in the case of *Pierce* v. *Society of Sisters of Holy Names,* 268 U.S. 510 [45 S.Ct. 571, 69 L.Ed. 1070, 1078, 39 A.L.R. 468]:

"Under the doctrine of *Meyer* v. *Nebraska,* 262 U.S. 390, 67 L.ed. 1042, 29 A.L.R. 1446, 43 S.Ct. 625, we think it entirely plain that the Act of 1922 unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control. As often heretofore pointed out, rights guaranteed by the Constitution may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the state. The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."

The released-time plan for religious education does no violence to any constitutional prohibition. It is in use and has been approved by appellate courts in other states. It does not discriminate in favor of any sect or religion. It is squarely within the purview of article IX, section 1 of the California State Constitution which provides:

"A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of people, the legislature shall encourage by all suitable means the promotion of intellectual, scientific, *moral* and agricultural improvement." (Emphasis supplied.)

Appellant's and interveners' petitions for a hearing by the Supreme Court were denied May 8, 1947.