## Pennsylvania Department of Agriculture v. Hill et al.

*F. Joseph Thomas* and *Metzger & Wickersham,* for appellants.

*Robert H. Maurer,* Assistant Deputy Attorney General and *Robert E. Woodside,* Attorney General, for Commonwealth.

SMITH, P. J., May 26, 1954.—In the instant proceeding defendants, Irl Hill, et al., duly filed in this court an appeal and exceptions to an adjudication dated January 4, 1950, made by the Secretary of Agriculture of the Commonwealth of Pennsylvania (hereinafter sometimes called the secretary). In the adjudication the secretary denied petitions filed by a group of herd owners of cattle in Crawford County requesting that the area plan for the control and eradication of brucellosis (commonly known as bang disease) be discontinued in the county. This adjudication was made after an informal hearing held by him in Meadville on December 6, 1948, at which time witnesses for and against the continuance of the area plan were heard, although not sworn or permitted to be cross-examined. Thereafter, at the secretary's request, this court, on November 15, 1951, remanded to him the record, theretofore certified to it, for "further testimony; . . . , with the right to the defendants to file

additional exceptions to any further adjudication filed
by the plaintiff."

Subsequently, the secretary, in accord with the pro-
cedure as set forth in the Administrative Agency Law
of June 4, 1945, P. L. 1388, 71 PS §1710.1 et seq., pkt.
pts. held hearings at Meadville on March 11 and 12,
1952, and at Harrisburg on September 11, 1952. On
March 18, 1953, the secretary filed a second adjudica-
tion in which, after making findings of fact and con-
clusions of law, he ordered and decreed that the area
plan for the control and eradication of bang disease
in cattle (hereinafter sometimes called the area plan)
be continued in Crawford County. The entire record
was then recertified to this court. To the second adju-
dication, appellants filed additional exceptions. After
argument before the court en banc, the appeal is now
for disposition.

Before specifically considering appellants' excep-
tions to the adjudications of the secretary here in
question, we deem it advisable for a better understand-
ing of the instant controversy, to first briefly sum-
marize certain facts giving rise thereto[1] and to state
the controlling statutory provisions.

Bang disease is one of the most contagious and in-
fectious diseases in this country at the present time.
It is more prevalent in cattle where the disease brings
about abortions, causes a decreased milk yield and
produces contaminated milk. Once in a herd the disease
is difficult to control and can bring about breaks in the
ranks of valuable pure bred families. Further, it is
well settled that undulant fever is transmitted to man

---

[1] In so doing we shall not consider the statements of witnesses
made to the secretary at the hearing held by him in Meadville on
December 6, 1948, unless reaffirmed by them at any of the sub-
sequent hearings where all witnesses were sworn and their cross-
examination permitted.

either by contact with an animal infected with bang disease or by drinking the milk of such animal.

For these reasons, among others, for many years the Commonwealth of Pennsylvania and 44 other States have been cooperating closely with the United States Department of Agriculture, Bureau of Animal Industry, in efforts to control and eradicate bang disease in domestic animals including dairy and breeding cattle.

The Administrative Code of April 9, 1929, P. L. 177, in section 1702, 71 PS §442, provides, inter alia:

"The Department of Agriculture shall have the power, and its duty shall be:

"(a) To promote the live stock industry, and to prevent, suppress, control, and eradicate any transmissible diseases of animals and poultry;

"(b) To establish and maintain quarantines, as may now or hereafter be provided by law;

"(c) To prevent the spread of infectious and communicable diseases of animals . . . to take such measures as may seem advisable concerning methods of preventing, controlling, and eradicating disease of animals, to cause the disinfection of any premises, and, when deemed necessary to prevent the spread of disease, to cause the destruction of animals, poultry, and personal property, and to regulate and prohibit the movement or transportation of animals or poultry into this Commonwealth, or from one place to another within this Commonwealth;

"(f) To make such examinations and tests as may be deemed necessary to determine the healthfulness of the domestic animals and poultry of the Commonwealth."

And also, in section 1708 thereof (71 PS §448):

"The Department of Agriculture shall have the power to establish general quarantines relating to diseases of animals . . . and to make all needful rules

and regulations for the enforcement of the laws relating to animals. . . ."

Further, the Act of April 17, 1929, P. L. 533, entitled "An Act Regulating the quarantining of animals, poultry, premises, localities, and areas in the Commonwealth; defining quarantines, and the powers and duties of the Department of Agriculture, its officers and agents in establishing and enforcing quarantine; and providing penalties for the violation of this act", provides, inter alia:

"The following named diseases, and any other diseases . . . shall be known as dangerous transmissible diseases within the meaning of this act: . . . bang disease or infectious abortion": Section 2, 3 PS §342.

". . . the Department of Agriculture shall have power, . . . to establish and enforce quarantines of any infected, exposed, suspected, or susceptible animals, . . . and quarantines on or in or for or against any premises, area, or locality, . . .": Section 3, 3 PS §343.

"A special quarantine may be established and enforced . . . whenever it is deemed necessary or advisable . . . to examine or test or treat or control or kill any animal . . . for the purpose of preventing or controlling the spread of dangerous transmissible disease": Section 5, 3 PS §345.

"The Department of Agriculture shall, . . . have the power to make all needful rules and regulations for the enforcement thereof": Section 9, 3 PS §349.

Pursuant to the above statutory provisions, the Pennsylvania Department of Agriculture from time to time has promulgated regulations operating uniformly throughout the State for the control and eradication of bang disease.

For this purpose, in 1937, by regulations duly issued, the department instituted the area plan, also known

as the test and slaughter plan. This plan incorporated the recommendations of leading authorities in the field of live stock sanitation and health and from the time of its inception to the present day is recognized as the most effective program available. Thereunder, when 85 percent (now 90 percent) of the herd owners in a certain township or county petitioned for the area plan periodic tests of all cattle therein for bang disease were made by veterinarians assigned and paid by the State Bureau of Animal Industry, or by veterinarians employed and paid by the herd owner under what is known as the individual plan under the area plan. All cattle which reacted to the test in a positive manner were designated as reactors and were immediately quarantined to be slaughtered at certified slaughter houses. Further, thereunder, provisions for retests were made and permits were necessary before any diseased cattle could be removed from the premises. Indemnities were also paid by the Commonwealth of Pennsylvania and the Federal Government to owners of the diseased cattle thus killed. Those paid by the Commonwealth are under the provisions of the Act of June 22, 1931, P. L. 682, as last amended, 3 PS §398-400(a), and the rules and regulations duly adopted pursuant thereto.[2]

---

[2] On pure bred cattle the maximum indemnity paid by the State is $50 per head and that paid by the Federal Government is $50 per head. On dairy cattle the maximum indemnity paid by the State is $32.50 per head and that paid by the Federal Government is $25 per head. From 1937 when the payment of indemnities was first instituted in Pennsylvania until September 1952, the State has paid on account of indemnities in Crawford County approximately $596,442. Over this period approximately 35,723 herds or 389,556 dairy and breeding cattle have been tested or retested for bang disease and 15,000 to 17,000 reactors killed. Retests up until a short time prior to September 1952, were made every three years. They now are made every two years.

In 1937, at the request of upward of 85 percent of the herd owners of Crawford County, the area plan was put into effect in that county. Thereafter, in September 1940 Crawford County was declared by the appropriate State and Federal coöperating agencies to be a recognized modified accredited bang disease free area for the period of three years under the rules and regulations of the department then in force and effect and under the conditions therein prescribed; and this because the infection was under one percent of the total number of the cattle in the county and less than five percent of the total number of herds therein.

In 1943 a modification of the area plan was adopted as an emergency measure called the B plan, whereunder a herd owner was permitted to retain reacting cattle under specified conditions segregated from the main herd until they proved unproductive. Under this modification the percentage of reactors then held in the Crawford County herds exceeded the maximum percentage allowable to qualify it as a modified accredited bang disease free area. Thereby Crawford County lost the recognition gained by it in 1940.

On September 17, 1947, after meetings with representatives of all phases of the cattle industry in this State, the Department of Agriculture adopted a regulation prohibiting the establishment of new B plan herds in counties being tested under the area plan. This regulation also provided that B herds in counties on the area plan be discontinued as soon as possible.

Certain herd owners in Crawford County objected to the withdrawal of the B plan. Thereupon the secretary agreed that the Department of Agriculture would discontinue the area plan in Crawford County if a majority of the herd owners in that county petitioned the department so to do.

Thereafter, on October 19, 1948, 2,187 herd owners

of Crawford County filed petitions (hereinafter some-
times called decontrol petitions) with the State De-
partment of Agriculture requesting it and the United
States Department of Agriculture to discontinue
therein the area plan of brucellosis control and eradi-
cation. These petitions were on a form—petitioner's
exhibit 3—supplied by the secretary.

Subsequently, on December 6, 1948, the secretary,
as hereinbefore stated, held a hearing at Meadville for
the purpose of affording an opportunity to all inter-
ested parties to express their opinion on the question
as to whether or not the department should continue
the area bang disease control in Crawford County.
At this hearing 26 additional decontrol petitions were
presented to and received by the secretary. Also thereat
608 herd owners in writing formally withdrew the
decontrol petitions theretofore signed by them. This
left only 1,605 herd owners who finally voted for de-
control.[3]

As to the number of herds in Crawford County, Mr.
Middour, administrative assistant to the State Bureau
of Animal Industry, testified as follows:

"On brucellosis, our last complete test in Crawford
County covered 4,129 herds on the area plan, and at
the same time the number of herds under the indivi-
dual plan were 512."

"Q. Now, you stated then that you had a brucellosis
test of 4,129 herds under the area plan and 512 herds
under the individual plan?

"A. That is right, in 1947.

"Q. What year was that?

---

[3] For these figures see the actual decontrol petitions filed and
the subsequent withdrawals therefrom broken down as to each of
the 35 townships comprising Crawford County received in evidence
but apparently not marked as an exhibit.

"A. 1947."
—or a total of 4,641 herds.[4]

Thereupon, on January 4, 1950, the secretary filed his first adjudication wherein he found that a majority of the herd owners in Crawford County did not vote in favor of decontrol and denied the petitions to discontinue the area plan in that county. Further, therein he stated that the Department of Agriculture would continue this plan under the regulations, (Commonwealth's Exhibit A), duly adopted and effective January 2, 1950. Thereunder, a herd owner in Crawford County now can have: (a) Straight test and slaughter under the area plan or the individual plan; (b) plan A test and slaughter with vaccination under the area plan or the individual plan; and (c) plan B under the individual plan where a herd owner may, if he elects, hold his reactors for a designated period of time. Any herd owner under the area plan also has the privilege of transferring to plan B.

From the adjudication of January 4, 1950, an appeal was taken by certain Crawford County herd owners to this court and exceptions filed in support thereof.

Thereafter, as herein previously stated, the record was remanded, and the secretary, after holding hearings in accordance with the provisions of the Administrative Agency Law, made a second adjudication in which he affirmed his first adjudication. To this adjudication appellants duly filed additional exceptions.

---

[4] The secretary in his adjudication of March 17, 1953, hereinafter referred to, attached at the end thereof a breakdown of the "Bang Disease Tested Herds in Crawford County—October 15, 1948". This shows a total of 4,548 herds. Petitioners' Exhibit 7, captioned "Herds and Cattle under Federal-State Supervision for Bang Disease—Individual and Area Plan", dated February 15, 1952, shows a total of 4,675 herds in that county.

## Discussion

It is well settled that a State has the power to enact sanitary laws designed to prevent the spreading of contagious and infectious animal diseases and that it may delegate power to an administrative agency to make rules and regulations for the enforcement thereof. See exhaustive note in 65 A. L. R. pp. 528-534, citing, inter alia, Commonwealth v. Falk, 59 Pa. Superior Ct. 217. Further, in respect to the latter proposition, in Bell Telephone Company of Pennsylvania v. Driscoll et al., 343 Pa. 109, the court said, pp. 113-114:

". . . The limits upon the power to delegate authority are set forth in the leading case of *Locke's Appeal*, 72 Pa. 491, 498: 'The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend, which cannot be known to the law-making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation.' Where the legislature establishes primary standards and then delegates to an administrative body the power to determine some fact or state of things upon which it makes or intends to make its own action depend, it is the legislature which has legislated and not the administrative body. . . ."

Appellants, however, in their brief contend that the exceptions filed by them to the adjudication and order of the secretary must be sustained for the following basic reasons:

"(1) That the two thousand two hundred sixteen (2,216) petitions secured and filed by them upon the representations of the Secretary of Agriculture con-

stituted a majority of the herd owners in Crawford County, and that the secretary had no right to permit the withdrawal of said petitions without first giving notice to the Appellants and affording them an opportunity to secure additional petitions.

"(2) That the area plan in existence in Crawford County resulting in forced test and slaughter is unfair, discriminatory and not uniform, and is, therefore, unconstitutional.

"(3) That the Department of Agriculture cannot under the guise of preventing, controlling, or eradicating the transmissible diseases of animals adopt and enforce regulations which are not uniform as to all herd owners, and which result in discriminatory regulations against the herd owners of Crawford County and result in the taking and destruction of their property without due and uniform process and without the payment of fair and proper indemnities."

No extended discussion is required in sustaining the secretary's action with respect to appellant's first basic reason, which is predicated on testimony given by certain herd owners that October 19, 1948, was fixed by the secretary as the last day for the filing of decontrol petitions. The record does not disclose that the secretary made any such representation or that he authorized anyone else so to do. In fact 26 decontrol petitions were filed by the appellants and received by him at the hearing held in Meadville on December 6, 1948, at which time 608 herd owners also were permitted to formally withdraw their decontrol petitions. We are of the opinion that in thus acting the secretary was properly exercising the discretion lodged in him. It thus appears, under all the testimony, that only 1,605 herd owners in Crawford County voted for decontrol. Again, the records of the Department of Agriculture disclose that the number of herds in Crawford County as shown by the last complete brucellosis

test made therein in 1947 was 4,641. As against these records, we cannot accept the unsupported general statements made by certain herd owners that the records are not correct in that a number of herds therein listed were no longer in existence. We accept the figures of the Department of Agriculture and find that a majority of the herd owners of Crawford County did not petition for decontrol.

Appellants' second and third basic reasons, as raised by the exceptions filed in support of their appeal, we shall consider together since they are closely interrelated.

Manifestly, the Acts of April 9, 1929, P. L. 177 and April 17, 1929, P. L. 533, supra, were passed by the legislature, inter alia, to control and eradicate contagious and infectious diseases in cattle. As such they are clearly within the police power vested in the State: Powell v. Pennsylvania, 127 U. S. 678. And thereunder the State may order the slaughter of diseased cattle either with or without the payment of indemnities. Thus in Lawton v. Steele, 152 U. S. 133, 136, when considering the extent and limits of the police power, the court said:

". . . It is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. Under this power it has been held that the State may order . . . ; the slaughter of diseased cattle; . . ."

Again, as stated in 2 Am. Jur., §160, at pp. 810-11, citing numerous authorities:

"Provisions for the impounding and destruction of animals suffering from contagious or infectious diseases are very general in the statutes of the several states. Most of the statutes provide for compensating the owner for the loss of his stock, so that their validity

has not been frequently questioned. However, there seems to be little doubt that the legislature may, when necessary to secure public safety, authorize the summary destruction of diseased domestic animals. A statute providing for the destruction of diseased animals, with compensation to the owner, is valid as an exercise of the sovereign police power to protect the public from the spread of a disease among domestic animals. Although only partial compensation is provided for, this is held not to render such statutes unconstitutional, since the legislature is not bound to provide for compensation on abating a public nuisance. Statutes permitting such destruction without making compensation to the owner have been upheld on the ground that it is a valid exercise of police power to require the destruction of that which is a public nuisance."

To the same effect see also 2 Am. Jur. §§36 to 40, inclusive; 11 Am. Jur. §271; Annotations in 8 A. L. R. 70; 67 A. L. R. 208; Aguiar and Bello et al. v. Brock et al., 24 F. Supp. 692 (Cal.); Loftus et al. v. Department of Agriculture of Iowa et al., 211 Iowa 566 (1930), 232 N. W. 412, and Durand v. Dyson, 271 Ill. 382, 111 N. E. 143 wherein the court said, p. 389:

". . . It is also now generally recognized that where the disease among cattle is so very dangerous and of so contagious or infectious a character as to be communicable to human beings through the consumption of the flesh or milk of such animals as have the disease, as the foot and mouth disease is generally considered to be, legislatures may, and should, confer upon boards or commissions the power to destroy animals afflicted with such a disease when thought to be necessary to public safety. . . ."

We have no difficulty, therefore, in finding that the area or test and slaughter plan for the control and eradication of bang disease, either with or without

the payment of indemnities for the reactors required to be killed, does not in any way result in the taking and destruction of property without due process.

The final question before us for consideration is appellants' contention that the regulations of the department of Agriculture (Commonwealth's Exhibit A) effective January 2, 1950, in force when the secretary handed down his final adjudication wherein he refused to discontinue the area plan in question in Crawford County are unfair and discriminatory and therefore invalid for the reason that all the counties in the State are not under this plan.[5] Appellants in their brief filed with us cite no authorities in support of this contention. There would be merit to it if the legislature had provided that every herd owner in the entire State was required to be under the test and slaughter plan. However, the legislature has not so provided. On the contrary, it gave the Secretary of Agriculture the power to adopt regulations which in his considered judgment were best adapted to carry out the mandates of the legislature for the control and eradication of bang disease. The secretary at all times after giving full consideration to the recommendations of the Federal Bureau of Animal Industry has from time to time promulgated regulations uniformly applicable throughout the entire State whereunder, inter alia, the area or test and slaughter plan is not put into

[5] As appears from the records of the Bureau of Animal Industry (petitioner's exhibit 7) on February 15, 1952, out of 67 counties in the State, 49 thereof, including Crawford County, were on the area plan for the control and eradication of bang disease. Thirty out of these 49 counties were completely tested and 19 of them partially tested. In Erie County only one township was under the area plan. It thus appears that, although no herd owner in Crawford County could sell his cattle without restriction and was required to sell diseased cattle to specified slaughter houses, in Erie County, with the exception of one township, the herd owner could sell and dispose of his cattle without a permit.

effect by him in any township or county until 85 percent (now 90 percent) of the herd owners therein petitioned him so to do. Thereafter, all herd owners in such territorial unit automatically came under the area plan with the consequent benefits and a broader market for milk derived therefrom.[6] In our opinion, the secretary had the power to issue such regulations.

Many States have enacted statutes providing for the area plan for the control and eradication of infectious, contagious and communicable diseases in cattle after a specified percentage of the herd owners in a territorial unit such as a township or a county have requested that it be put into effect. See 65 A. L. R. 550-552. These statutes have been upheld by the courts. The leading case on this question referring to such statutes and citing the cases construing the same is People v. Teuscher, 248 N. Y. 454, 162 N. E. 484. Here a statute of the State of New York authorized the Commissioner of Farms and Markets whenever 90 percent of the herds of cattle in any township have been subjected to the tuberculin test—the Township of Rome was in this category—to quarantine the herd of any owner therein who refused or neglected so to do. This statute was held to be valid and not a denial of the equal protection of the laws by arbitrary preference of localities and persons and unrelated classification.

---

[6] See Commonwealth's exhibit B wherein, under the authority of an ordinance of the City of Pittsburgh, the director of the department of public health of said city duly issued regulation no. 52 providing inter alia, that "All dairy animals producing milk for reception by milk plants, milk receiving stations, or ice cream plants operating under the jurisdiction of this Department shall be officially tested for Brucellosis (Bang's Disease) or shall be enrolled in a program assuring the completion of said testing. Upon completion of said testing, positive reacting animals shall be handled in accordance with existing State and Federal Laws and regulations pertaining thereto."

In so holding, Cardozo, C. J., speaking for the Court of Appeals of New York, said (pages 460, 463-64) :

"We find no arbitrary preference of localities or persons, no classification unrelated to the mischief to be remedied. The plan of the statute is to make the township the territorial unit in the war upon unhealthy cattle. More will be accomplished, it has been thought, by attacking the units severally than by going against all together [citing authorities]. No doubt there are gaps and leaks in any scheme of subdivision. Milk from the herds in the tested town of Rome will be rid of the infection, but milk may be brought from untested towns nearby, and sold even in Rome, without offense against the statute. This is far from saying that the purification of the source of supply in a given territorial unit is not a public good. At least the local herds will be sound, and buyers from that source of supply will have a certificate of safety. A class may lawfully be restricted if the lines defining the restriction are not arbitrary altogether, and the rule to be applied within them is uniform and even. . . .

"Enlightening is the course of legislation in states other than our own. There, as here, experience has shown that the most effective method of attack is by division into units, established, not merely by coercion, but with the willing coöperation of the persons most affected. A system known as the 'county area plan' and the 'county area accredited plan' has found a place upon the statute books with the approval of the courts. . . .

"A different question would be here if the majority within a group could impose its will on a minority for the advancement of its own welfare, unrelated to the public good. Such a case was Eubank v. City of Richmond, 226 U. S. 137, where two-thirds of the owners on a city block were at liberty for their own convenience to compel the other third to set the houses back.

Here the good to be attained is not selfish merely, or personal to those whose cattle have been tested. There is benefit to them, but also something more. Bound up with their protection is the advancement of a public good, the preservation of the public health [citing authorities].

"Ninety per cent. of the cattle owners in the township of Rome have said by their acts that the test rejected by the defendant is useful and desirable. Legislation in this state and elsewhere has confirmed their judgment. Acts of Congress have done the same. (See, e. g., Mason's Fed. Code, art. 21, §§111, 123. The defendant holds out, and says the test is worthless. The Constitution does not protect him in this assertion of his own will against a judgment so preponderant (Matter of Viemeister, 179 N. Y. 235) )."

Again in People v. Stimer, 248 Mich. 272, 226 N. W. 899, a statute gave authority to the Commissioner of Animal Industry to test and slaughter for tuberculosis in cattle and also the general duty to guard domestic animals from contagious and infectious diseases. The statute, however, did not specify the method to be adopted in carrying out its provisions in any county. Defendant, a herd owner in Jackson Township, Mich., was convicted under the provisions of the statute when he refused to allow an authorized veterinarian to conduct tests for bovine tuberculosis. Defendant then appealed from this conviction alleging, among other things, that (1) the statute did not authorize compulsory examination or testing, and (2) the Commissioner of Agriculture had no authority to examine or test his cattle because the program for eradicating bovine tuberculosis had not been adopted in Jackson Township. In rejecting both of these contentions, the Supreme Court of Michigan said (page 900) :

"By the express provisions of the statute, the authority to examine is given. There is no merit to de-

fendant's contention that the eradication program was not adopted in Jackson County and therefore authority was not given to the commissioner or those representing him to make an examination and under proper conditions to test domestic animals. This record discloses that both by popular vote and by action of its board of supervisors Jackson County adopted or approved a program of eradicating bovine tuberculosis in that county. It is true, as pointed out by defendant, that the act does not specifically provide the method of adoption by a county; but, in the absence of a specific provision as to adoption in some other manner, it should be held that the action taken in Jackson County was sufficient. . . ."

The legislature did not in the Acts of April 9, 1929, P. L. 177, and April 17, 1929, P. L. 533, specifically provide the procedure for the establishment of the area plan in a designated territorial unit, as did the statute of the State of New York construed in the Teuscher case, supra. Neither did the Michigan statute, construed in the Stimer case, supra. However, our acts expressly delegate to the Department of Agriculture the power to make all needful rules and regulations for the enforcement thereof, including the power to establish and maintain quarantines on or in or for or against any premises, area, or locality. In our opinion, a class may be lawfully restricted, if the lines defining the restriction are not arbitrary altogether, and the rule to be applied within them is uniform and even.

Upon application of the principles of the cases heretofore cited to the facts as disclosed by the record, we find that the regulations, here questioned by appellants, providing for the establishment of the area plan upon the request of 85 percent (now 90 percent) of the herd owners of a township or county are not unfair or discriminatory to the herd owners of Crawford County, even though said plan is not in force and

effect in other territorial units within the State, and this solely because the required percentage of herd owners therein have not petitioned the Department of Agriculture to be placed thereunder.

In view of the foregoing, we sustain the findings of fact, conclusions of law and order in the adjudication made March 17, 1953, by the Secretary of Agriculture of the Commonwealth of Pennsylvania wherein the area plan for the control and eradication of bang disease in cattle was continued in Crawford County, and overrule the exceptions filed thereto.

### Order

And now, May 26, 1954, the appeal of Irl Hill, Paul Hamilton, Frank Canfield, and others, is hereby dismissed; costs to be paid by appellants.